David Edwin WIEDE, Appellant,

v.

The STATE of Texas, Appellee.

No. 03–03–00325–CR.

Court of Appeals of Texas, Austin.

Jan. 21, 2005.

John Fahle, Carter and Fahle, San Antonio, for Appellant.

Whitney S. Wiedeman, Asst. Crim. Dist. Atty., Lockhart, for State.

Before Chief Justice LAW, Justices B.A. SMITH and PATTERSON.

## *OPINION*

BEA ANN SMITH, Justice.

In 1997, David Wiede pleaded guilty to a charge of possession of methamphetamine and was sentenced to ten years in prison; imposition of the sentence suspended and he was placed on probation for ten years.[1] In 2002, the State moved to revoke his probation, alleging that he had violated the terms of his probation by again possessing methamphetamine and by failing to pay fines and fees. Wiede pleaded not true to all the allegations in the State's motion and moved to suppress evidence obtained as

---

1. At the same time he pleaded guilty to possession of marihuana. He was sentenced to two years in prison, imposition of sentence was suspended and he was placed on probation for five years. Wiede successfully completed that probationary term, and that offense is not before us.

the result of an unlawful search of his car. In its written order, the court denied Wiede's motion, found all the State's allegations to be true, revoked Wiede's probation, and sentenced him to eight years in prison.

On appeal, Wiede contends that the trial court erred in revoking his probation by two points of error (1) that the district court erred by admitting into evidence the methamphetamine related to the new offense, and (2) that the district court erred by considering his failures to pay fines and fees because the State waived those grounds at trial. The State contends that the evidence was properly admitted, but concedes that it waived at trial the administrative grounds for revocation and that the court consequently erred by revoking Wiede's probation on those grounds. Because we hold that the search of Wiede's car was an unreasonable search under the Fourth Amendment of the United States Constitution, we will reverse the judgment and remand the cause to the trial court for further proceedings.

## BACKGROUND

The following is a summary of testimony from the combined hearing on the motion to suppress and the motion to revoke probation. The hearing occurred on two days a week apart.

At approximately 7:00 a.m. on April 17, 2002, motorist Roy Tambunga stopped at the T-intersection of Siebert Drive and F.M. 150 behind an 18-wheel truck loaded with sod. He waited while the truck turned left onto F.M. 150. As Tambunga turned right onto F.M. 150, he saw Wiede's car pass by. Although he was unsure of Wiede's speed, he testified that the car

was traveling "at least the speed limit, at least 60 miles an hour." Looking through his side view mirror, Tambunga watched as Wiede collided with the truck that had turned onto the road in front of him. A photograph of the accident scene introduced into evidence shows long skid marks caused by Wiede's car prior to the collision. The truckdriver continued driving as if unaware the accident had occurred. Tambunga stopped to check Wiede's condition. Wiede's head was bleeding and his arm appeared to have a compound fracture. (Wiede later was found also to have a fractured pelvis that required a plate and multiple screws to mend.) Tambunga testified that Wiede was conscious but dazed, in pain, and moaning occasionally. A department of public safety trooper stopped and called in the accident.

Tambunga remained near Wiede's car and saw him moving around and looking back at Tambunga. At one point, Wiede's movements led Tambunga to believe he was going to light a cigarette. Leaning forward to dissuade Wiede from smoking, Tambunga saw Wiede instead cupping an item in his hand and pushing it between the console and the front seat; Tambunga never saw the item. Another peace officer arrived. After Wiede was removed from the car and taken to an ambulance, Tambunga told the unidentified officer, "You may want to check the seat, because he was messing around with something there." [2] The officer reached into the car and pulled out an empty plastic bag less than two inches square that Tambunga said was too small to be what Wiede had held. The officer reached in again and pulled out a larger plastic bag that ap-

---

**2.** Tambunga testified that the unidentified officer was possibly a sheriff's deputy or a Kyle city policeman. Tambunga testified that he was new to the area and did not know the area departments' uniforms. He was certain, however, that the person was neither an emergency medical technician nor a state trooper.

peared to contain about a half inch of an off-white powder.

Tambunga testified that after stopping he was never more than eight feet from Wiede until the emergency medical technicians moved Wiede to the ambulance. Tambunga did not hear the officers ask Wiede where he wanted his car taken. Tambunga testified that he did not see any officer search the car after finding the baggies or write down anything on a form. Tambunga was at the scene until the tow truck hooked up to Wiede's car.

DPS trooper Christopher McGuairt testified that he and other peace officers were driving to a training session in San Marcos when they came upon the accident scene and stopped. (Because McGuairt is based in Fort Stockton, he stopped to secure the scene but did not investigate the accident.) After Tambunga described the vehicle Wiede collided with, McGuairt drove on and stopped the truck driver, who was apparently unaware the collision had occurred; McGuairt and the truck returned to the scene. McGuairt said that Tambunga then told him and the unidentified officer something[3] that prompted the other officer to reach into the car near the center console and retrieve a plastic bag containing an off-white powdery substance. McGuairt testified that, based on Tambunga's statement, the officer looked only by the console and did not search the car generally.

McGuairt, who was unfamiliar with the uniforms of local law enforcement agencies, was uncertain whether the person who retrieved the contraband was a deputy sheriff or an officer of another department. Based on the person's uniform, badge, sidearm, and conversation with other peace officers, McGuairt testified that

the person was either an officer or impersonating one; McGuairt was reasonably certain that the person was an officer.

On the second day of the hearing, McGuairt testified that the severity of the wreck gave him concern for Wiede's health and well-being. Moreover, Tambunga's statement made him suspect that the item stashed near the console might be a controlled substance, that Wiede might be under the influence of that controlled substance, that medical personnel treating Wiede would need to know what that substance was, and that the nature of the substance could affect civil liability regarding the accident. However, he did not inform the medical personnel about the recovered substance, did not remind the investigating officer to notify the medical personnel to test Wiede for controlled substances, and did not hear the investigating officer do so.

DPS Trooper Brian Freeman investigated the accident. He testified that the collision rendered Wiede's car inoperable. Freeman said that McGuairt gave him a clear plastic bag suspected of containing a powdery controlled substance. Freeman testified that his supervisor conducted an inventory of the car, but the inventory report listed only the baggie seized from the car and did not list items in plain view in the car, such as the many compact discs that a friend of Wiede's later retrieved. Freeman testified that Wiede's vehicle was towed to an impound lot, but not to a DPS facility.

Wiede was hospitalized following surgery and was concerned that the items left in his car might be stolen. Wiede's friend, David Duggan, testified that he went to the lot where Wiede's car was towed and

---

3. The Court sustained Wiede's hearsay objection to McGuairt's testimony about what Tambunga said.

removed valuable items at Wiede's request. Duggan testified that he removed a compact disc player, several CDs, a CD changer, a stereo system, an amplifier, Snap-on tools, Oakley sunglasses, clothes, a silver ring, a gold chain, a nice winter coat, boots, two credit cards, and change. Duggan testified that the items appeared valuable and that Wiede tended to have top-of-the-line possessions.

The district court orally denied the motion to suppress. The court held that the drugs were not found pursuant to an inventory, but as part of an investigation into what Wiede had concealed at the scene of this accident. Alternatively, the court cited the officer's role as a community caretaker as a basis for the search.

The hearing continued on the motion to revoke. Wiede testified, denying ownership or knowledge of the drugs found in his car. His former sister-in-law, Kathleen Vann, testified that she had borrowed the car and, after invoking her right not to testify, rescinded that invocation and testified that the methamphetamine found in the car was hers. The district court then found the allegation of methamphetamine possession true and revoked Wiede's probation.

## DISCUSSION

Wiede raises two points of error regarding the admission of evidence. He contends that the district court erred by denying his motion objecting to the admission into evidence of the baggie containing the methamphetamine, contending that the officers lacked any legal basis for their warrantless search of his vehicle. He also asserts that the State failed to establish a chain of custody of the baggie.

■ In reviewing a ruling on a challenge to the admission of evidence, we give almost total deference to the trial court's determination of historical facts and review the court's application of search and seizure law de novo. *Balentine v. State,* 71 S.W.3d 763, 768 (Tex.Crim.App.2002). When the trial court does not make explicit findings of historical facts, we review the evidence in a light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact supported in the record. *Id.* We must affirm the trial court's ruling if it can be upheld on any valid theory of law applicable to the case—even if the trial court did not base its decision on the applicable theory. *State v. Steelman,* 93 S.W.3d 102, 107 (Tex.Crim.App.2002); *Romero v. State,* 800 S.W.2d 539, 543–544 (Tex.Crim.App.1990).

■ Once the defendant establishes that a police search was not supported by a warrant, the burden shifts to the State to prove the reasonableness of the search and seizure. *Russell v. State,* 717 S.W.2d 7, 9–10 (Tex.Crim.App.1986); *Mendoza v. State,* 30 S.W.3d 528, 531 (Tex.App.-San Antonio 2000, no pet.) (burden on State to prove reasonableness of warrantless search of vehicle). It is undisputed in this case that Wiede was not arrested and that the search was warrantless.

■ The dissent contends that we have failed to adhere to the standard of review. Indeed, the dissent correctly recites the standard of review for a probation revocation determination. *See Ortega v. State,* 860 S.W.2d 561, 564 (Tex.App.-Austin 1993, no pet.) (burden of proof on state to show violation of conditions of probation as alleged in motion by preponderance of the evidence and trial court's determination reviewed for abuse of discretion). However, the evidence on which a trial court bases its determination must be properly admitted in accordance with established search and seizure law. *See Gordon v. State,* 4 S.W.3d 32, 35 (Tex. App.-El Paso 1999, no pet.) (overlapping

standards of review when considering suppression of evidence in decision to revoke probation); *State v. Barnett*, 790 S.W.2d 662 (Tex.App.-Austin 1990, no pet.) (applying standard of review for suppression in revocation of probation determination). Because the State only relies upon Wiede's possession of methamphetamine as grounds for the revocation of probation, our determination of whether the methamphetamine was properly admitted controls whether the trial court abused its discretion in this case. *See Gordon*, 4 S.W.3d at 38.

A number of possible justifications for the search of Wiede's car have been advanced in the State's brief, as well as by the dissent. The State asserts that the nature of the accident gave police probable cause to arrest Wiede and search his car for evidence either relating to traffic violations or other offenses. The State and dissent also contend that the search was valid under the officer's community caretaking function. The State concedes that police did not conduct an inventory search.

**Probable Cause**

 The State contends that the circumstances at the scene provided probable cause to search Wiede's car for evidence related either to a traffic offense or possession of a controlled substance. An officer may conduct a warrantless search of a motor vehicle if the officer has probable cause to believe the vehicle contains evidence of a crime. *Powell v. State*, 898 S.W.2d 821, 827 (Tex.Crim.App.1994). Police officers have the right to search an entire vehicle when they have probable cause to believe there is contraband in the vehicle but do not know where it is located. *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). Probable cause determinations in warrantless search situations are made using the same standard as searches involving warrants. *Whiteley v. Warden*, 401 U.S. 560, 566, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971). To determine whether probable cause existed to believe evidence of a crime would be found in a certain place, we look at the totality of the circumstances to determine if there is a substantial basis for concluding that probable cause existed at the time of the questioned action. *See Eisenhauer v. State*, 754 S.W.2d 159, 164 (Tex.Crim. App.1988), *overruled on other grounds, Heitman v. State*, 815 S.W.2d 681, 685 n. 6 (Tex.Crim.App.1991). An officer's inarticulate hunch, suspicion, or good faith is insufficient to constitute probable cause. *Brown v. State*, 481 S.W.2d 106, 110 (Tex. Crim.App.1972).

**Traffic offense**

 The State contends that Wiede's apparent violation of traffic laws provided probable cause to support his arrest, and therefore a search of his vehicle. The State asserts that the evidence at the scene—the long skid marks, the damage to Wiede's car, the observation that he was traveling around the speed limit of 60 miles per hour—provided probable cause to believe that Wiede violated the requirement that he control his speed sufficiently not to collide with another vehicle entering the highway. *See* Tex. Transp. Code Ann. § 545.351(b)(2) (West 1999); *see also id.* § 543.001 ("Any peace officer may arrest without warrant a person found committing a violation of this subtitle.").

 Courts permit a warrantless search of an automobile incident to the arrest of its occupants. *See New York v. Belton*, 453 U.S. 454, 460–62, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). Probable cause for an arrest exists where, at that moment, facts and circumstances within the knowledge of the arresting officer, and of which he has reasonably trustworthy information, would warrant a reasonably

prudent person in believing that a particular person has committed or is committing a crime. *See Smith v. State,* 739 S.W.2d 848, 851 (Tex.Crim.App.1987). It is irrelevant that the arrest occurs immediately before or after the search, as long as sufficient probable cause exists for the officer to arrest before the search. *Williams v. State,* 726 S.W.2d 99, 101 (Tex.Crim.App. 1986) (citing *Rawlings v. Kentucky,* 448 U.S. 98, 111, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980)). Courts permit warrantless searches incident to arrest even if no arrest has occurred at the time of the search, as long as the probable cause to support the arrest existed at the time of the search. *See State v. Ballard,* 987 S.W.2d 889, 892 (Tex.Crim.App.1999) (admitting evidence from search of truck driven erratically by man with slurred speech and impaired balance, despite officer's statement that he did not form impression as to cause of impairment and absence of arrest); *see also Dyar v. State,* 59 S.W.3d 713, 716–17 (Tex.App.-Austin 2001), *aff'd,* 125 S.W.3d 460 (Tex.Crim.App.2003) (admitting blood sample from intoxicated person pulled from wreckage in one-car accident and arrested in hospital).

The search in this case, however, was not incident to an arrest. Although the search incident to arrest can precede the arrest, the arrest must occur within the same encounter. In *Ballard,* the court of criminal appeals wrote:

> Moreover, the fact that the search incident to the arrest *preceded the formal custodial arrest by a few moments* is of no consequence under *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) ("Once [Rawlings] admitted ownership of the sizable quantity of drugs found in [the] purse, the police clearly had probable cause to place [him] under arrest. Where *the formal arrest followed quickly* on the heels of the challenged search of [Rawl-

ings'] person, we do not believe it particularly important that the search preceded the arrest rather than vice versa.")

726 S.W.2d at 101 (emphases added). But here there was no arrest for the traffic violation a few moments after the search or later at the hospital. This search was not conducted incident to an arrest.

Nor did the probable cause for an arrest, without the arrest, provide reason for a warrantless search of the car. *See Knowles v. Iowa,* 525 U.S. 113, 114–18, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998). In *Knowles,* an Iowa police officer stopped a driver for speeding and issued a citation rather than arresting the driver; the officer then searched the car, found marihuana, and arrested the driver. The United States Supreme Court held that the officer did not have reason to search the car. *Id.* Iowa courts had denied Knowles's motion to suppress, citing an Iowa statute permitting a search incident to the issuance of a citation for a traffic violation. *Id.* at 115. The Supreme Court concluded that a search incident to arrest is permissible on two bases: (1) the need to disarm the suspect in order to take him into custody, and (2) the need to preserve evidence for later use at trial. *Id.* at 117, 119 S.Ct. 484. The Supreme Court found that neither basis was present in the search of Knowles's car. *Id.* at 117–18, 119 S.Ct. 484. Regarding the need to preserve evidence, the Court wrote:

> Once Knowles was stopped for speeding and issued a citation, all the evidence necessary to prosecute that offense had been obtained. No further evidence of excessive speed was going to be found either on the person of the offender or in the passenger compartment of the car.

Iowa nevertheless argues that a "search incident to citation" is justified because

a suspect who is subject to a routine traffic stop may attempt to hide or destroy evidence related to his identity (e.g., a driver's license or vehicle registration), or destroy evidence of another, as yet undetected crime. As for the destruction of evidence relating to identity, if a police officer is not satisfied with the identification furnished by the driver, this may be a basis for arresting him rather than merely issuing a citation. As for destroying evidence of other crimes, the possibility that an officer would stumble onto evidence wholly unrelated to the speeding offense seems remote.

*Id.* at 118, 119 S.Ct. 484. The Court reversed the conviction and remanded the cause.

The State's attempt to base the search on the alleged traffic violation makes this case strikingly similar to *Knowles*. Although there was no citation issued here, the reasoning is applicable. The officers had Tambunga's eyewitness testimony about Wiede's failure to control the speed of his car, and they could see the long skid marks on the road and the damage to the car. Speeding offenses under the transportation code are strict liability offenses. *Nam Hoai Le v. State,* 963 S.W.2d 838, 841 (Tex.App.-Corpus Christi 1998, pet. ref'd). The State did not produce evidence or articulate any reason to believe that a search of the car—particularly, the space between the driver's seat and the center console—would produce additional evidence relevant to the offense of failing to control speed. The officer must have probable cause to believe that the car contains evidence of the crime under investi-

gation, not evidence of some unrelated crime. *Powell,* 898 S.W.2d at 827.

*Other offenses*

The State alternatively argues that probable cause existed to search the vehicle for a controlled substance based on Tambunga's observation of Wiede furtively hiding a small object. This furtive gesture, coupled with the nature of the accident, urges the State, gave the officers probable cause to believe that Wiede was driving while intoxicated (or under the influence of some substance) and that the hidden object was the intoxicant. The State need not obtain a warrant prior to searching an automobile if probable cause exists to believe it contains contraband. *Pennsylvania v. Labron,* 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996). Therefore, we look to see if the State presented evidence supporting probable cause to believe that Wiede was either driving while intoxicated or otherwise in possession of contraband.

Construing the evidence most favorably to the district court's decision, the police knew that a bystander had seen the injured driver of a wrecked vehicle reach across his body with his uninjured arm while police were not watching and hide something smaller than his fist between the driver's seat and the center console.[4] Wiede was seriously injured, dazed, and moaning after the collision. But there is no evidence that he showed any signs of intoxication. Although Wiede was driving at or above the speed limit, there is no evidence that his driving before the collision was erratic. There is no evidence of any odors associated with intoxication or drug

---

4. We do not question the reliability of the information provided by the bystander Tambunga. *See Balentine v. State,* 71 S.W.3d 763, 768 (Tex.Crim.App.2002); *Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App.1997) (we give almost total deference to trial court's determination of credibility and historical fact). However, we emphasize that Tambunga's testimony is of limited value because he witnessed only a furtive gesture and not criminal activity.

possession emanating from Wiede or his car. There is no indication that any alcohol, drugs, or drug paraphernalia were in plain view; the photo of the interior of the car shows only clutter. Because the officer who actually conducted the search of Wiede's car was never identified and did not testify, there is no evidence in the record as to his actual motivation for the search.

The court of criminal appeals has repeatedly held that a "furtive gesture," such as the one described by Tambunga, made while a person is stopped for a traffic offense does not establish probable cause for a search. *See Howard v. State*, 599 S.W.2d 597, 604–05 (Tex.Crim.App.1979) (dipped down in seat toward steering wheel when stopped for failing to use turn signal); *Beck v. State*, 547 S.W.2d 266, 268–69 (Tex.Crim.App.1976) (reached toward glove compartment when stopped for failing to use turn signal); *Wilson v. State*, 511 S.W.2d 531, 535 (Tex.Crim.App.1974) (moved hand between seats when stopped for running red light); *see also Jenkins v. State*, 76 S.W.3d 709 (Tex.App.-Corpus Christi 2002, pet. ref'd); *Ramsey v. State*, 806 S.W.2d 954, 957 (Tex.App.-Austin 1991, pet. ref'd).

The facts surrounding the search of Wiede's car are similar to those found insufficient to justify a search in *Wilson*. Wilson was pulled over by police for running a red light. *Wilson*, 511 S.W.2d at 532. As Wilson pulled over to the side of the road, the police officer witnessed Wilson make a move with his hand between the two seats. *Id.* The police searched where Wilson had moved his hand and discovered contraband. *Id.* Similarly, Wiede committed the traffic offense of failing to control speed when he collided with the truck. While awaiting medical assistance, he reached between the seat and console with a small unidentified object in

his hand. Movements like Wiede's and Wilson's, even when coupled with a traffic offense, are not supportive of probable cause to search a vehicle "because of the ambiguous and potentially innocent nature of such movements." *Howard*, 599 S.W.2d at 604.

Moreover, we cannot conclude that Wiede's gesture, coupled with a traffic accident, constitutes "suspicious circumstances" that provided probable cause for the search. *See* Tex.Code Crim. Proc. Ann. art. § 14.03(a)(1) (West Supp.2004–05); *Dyar*, 59 S.W.3d at 716–17. Section 14.03(a)(1) of the code of criminal procedure only provides that an officer may make an arrest without first obtaining a warrant when there are "suspicious circumstances." There must still be probable cause to make the arrest. *See Dyar v. State*, 125 S.W.3d 460, 464 (Tex.Crim.App. 2003). Furthermore, the record does not support a characterization of this collision as "suspicious." Wiede attempted but was unable to stop his vehicle when a heavily loaded 18–wheel truck turned onto the road in front of him; there is no evidence in the record that he was driving erratically or that he was intoxicated. By contrast, "suspicious circumstances" were found in *Dyar* where a seventeen-year-old driver was taken to the hospital after his car left the road and turned upside down, police had been informed that Dyar was en route to Houston after "partying" for New Year's Eve, Dyar admitted to drinking alcohol and driving, and he appeared intoxicated. *Id.* at 461–62.

We also find no significant difference between Wiede's failure to stop for the truck and the failure to stop for a red light in *Wilson*. Although the United States Supreme Court has stated in dicta that vehicles are "exposed to traffic accidents that may render all their contents open to public view," *Houghton*, 526 U.S. at 303,

119 S.Ct. 1297, we do not read this comment, or any other precedent, to establish a general exception to the Fourth Amendment's probable cause requirement for the investigation of traffic accidents. *See New York v. Class,* 475 U.S. 106, 112, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986) ("A citizen does not surrender all the protections of the Fourth Amendment by entering an automobile.").

We conclude that, even when viewed most favorably to the district court's decision, the totality of the circumstances presented at the hearing did not demonstrate that the unidentified police officer had probable cause to believe that Wiede's vehicle contained evidence of a crime. Without any additional evidence of intoxication or another crime, Wiede's furtive gesture after colliding with the truck amounts to only reasonable suspicion not probable cause. Nor can we cumulate this reasonable suspicion and a police officer's duty to investigate a traffic accident to satisfy the Fourth Amendment. The search of a vehicle by the police is permitted only when there is probable cause to believe the search will uncover evidence of a crime or when the search is justified under one of the few specifically established and well delineated exceptions to the Fourth Amendment's requirement of probable cause. The traffic accident that transformed Wiede's furtive gesture into reasonable suspicion of criminal activity cannot also elevate reasonable suspicion to probable cause.

**Community caretaking**

Absent probable cause, an officer's warrantless search may be justified as conducted in the course of his community caretaking function. *See Laney v. State,* 117 S.W.3d 854, 858–59 (Tex.Crim. App.2003). The court of criminal appeals has stated that a court may consider evidence discovered by police who search

property without warrants while acting in their roles as community caretakers under three doctrines: the automobile impoundment/inventory doctrine, the emergency doctrine, and the *Cady* doctrine. *Laney,* 117 S.W.3d at 861. Having established these exceptions to the Fourth Amendment requirement of probable cause, however, the court cautioned: "While we today recognize the existence of the community caretaking function in Texas, we emphasize its narrow applicability." *Wright v. State,* 7 S.W.3d 148, 152 (Tex.Crim.App. 1999); *see also United States v. Robinson,* 414 U.S. 218, 243, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) ("Exceptions to the warrant requirement are not talismans precluding further judicial inquiry whenever they are invoked ... but rather are jealously and carefully drawn."); *Corbin v. State,* 85 S.W.3d 272, 281 n. 7 (Tex.Crim.App.2002) (Cochran, J., concurring) (emergency search must not be primarily motivated by intent to arrest and seize evidence and it is essential that courts be alert to possibility of subterfuge).

The State and the dissent assert that the search was conducted in the course of the officer's community caretaking function: assisting in Wiede's medical care and investigating an accident. We will explore all three types of community caretaking to see if there is support for the trial court's decision.

Under the inventory doctrine, police are permitted to search impounded vehicles to make an inventory of items in the car in order to protect the owner's property, to protect the police from claims for lost property, and to protect the police from dangerous contents. *Opperman,* 428 U.S. at 369–70, 375, 96 S.Ct. 3092. Under the emergency doctrine, police may conduct a search without a warrant if: (1) the officer's actions are totally divorced from the detection, investigation, or acquisition

of evidence, (2) there is an immediate, objectively reasonable belief that the search is necessary in order to protect or preserve life or avoid serious injury, and (3) the scope of the search is strictly circumscribed by the facts of the emergency. *See Laney,* 117 S.W.3d at 861–62; *Gonzalez v. State,* 148 S.W.3d 702, 708 (Tex.App.-Austin 2004, no pet. h.). Items police discover in plain view during such a search in response to an emergency are admissible. *See Laney,* 117 S.W.3d at 863. By contrast, the *Cady* doctrine addresses almost exclusively warrantless searches and seizures of vehicles and does not require an imminent threat to a specific person's well-being. *Id.* at 861; *see also Cady v. Dombrowski,* 413 U.S. 433, 448, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) (search disabled car suspected of containing gun permissible because car was "vulnerable to intrusion by vandals").

First, the State concedes that no inventory was made. We therefore decline to uphold the search of Wiede's vehicle on the basis of the inventory doctrine. *See also Aitch v. State,* 879 S.W.2d 167, 172 (Tex. App.-Houston [14th Dist.] 1994, pet. ref'd) (When police remove one item from car and fail to compile list of other valuable items in plain sight, item not removed pursuant to an inventory.).

 The record also does not support application of the community caretaking emergency doctrine or the *Cady* doctrine. The *Laney* standard for a search under the community caretaking emergency doctrine was set forth in the context of a search of a home. *See Laney,* 117 S.W.3d at 855 (search of private residence); *Gonzalez,* 148 S.W.3d at 704 (search of apartment). The court of criminal appeals has also held that the emergency doctrine can justify the stop of a moving vehicle based on concern for an occupant. *See Wright,* 7 S.W.3d at 151.

Factors in making a caretaking stop of such a vehicle include: (1) the nature and level of the distress exhibited by the individual; (2) the location of the individual; (3) whether or not the individual was alone or had access to assistance independent of that offered by the officer; and (4) to what extent the individual—if not assisted—presented a danger to himself or others. *Id.* at 152. We find these factors are also relevant to our consideration of whether the search was permissible in light of the emergency doctrine.

 We apply an objective standard of reasonableness, taking into account all of the facts and circumstances known to the police at the time of the search. *See Laney,* 117 S.W.3d at 862. We independently scrutinize the facts without regard to the subjective conclusions of the police. *Johnson v. State,* 722 S.W.2d 417, 419 (Tex.Crim.App.1986).

In *Wright,* a deputy sheriff stopped a car from which he had observed Wright leaning out of a rear window and vomiting. *Id.* at 150. The deputy had seen no violations of law before the stop, but testified that he stopped the car because he was concerned for Wright's safety and wanted to ensure that Wright was not being assaulted or denied medical attention. *Id.* After the stop, the deputy noted odors indicating consumption of alcohol and marihuana, and saw a partially smoked marihuana cigarette in plain view on the console between the front seats. *Id.* The court of criminal appeals vacated this Court's reversal of the trial court's judgment and remanded for analysis of the applicability of the four factors listed above. *Id.* at 152. On remand, this Court determined that the stop did not meet the test set out by the court of criminal appeals. *Wright v. State,* 18 S.W.3d 245, 247 (Tex.App.-Austin 2000, pet. ref'd). This Court wrote:

Appellant was a passenger in the rear seat of a car that was being driven in a lawful manner on a public highway. Appellant appeared to be having some gastric distress, but in addition to the driver, the other passenger in the car could have aided and assisted appellant. Nothing indicated that appellant's condition was any more serious than an upset stomach. None of the car's occupants indicated that they were in need of additional help. Nothing indicated that the deputy sheriff's assistance was necessary or that his help would add to the comfort or welfare of appellant. Nothing supported a reasonable belief that appellant was a danger to himself or to others.

The reasons for the stop given by the officer were unreasonably speculative and appear to be no more than an attempt through hindsight to justify the stopping and detaining of appellant. The totality of the circumstances did not justify official intrusion upon appellant's constitutional right to be secure in his person. The stop and detention of appellant was simply an unreasonable exercise of authority by the officer in violation of appellant's constitutional rights. *Id.*

Applying the *Wright* factors to this case, we acknowledge that Wiede was seriously injured and in need of medical attention. However, at the time of the search, Wiede was outside of his vehicle and in the care of emergency medical personnel who were preparing to take him to the hospital. Thus, the *Wright* factors weigh toward a finding that the search was unreasonable because Wiede was not alone, had access assistance other than that offered by the officer, and did not present a danger to himself or others. *See Wright*, 7 S.W.3d at 152. Although Trooper McGuairt explained that he believed that Wiede might be under the influence of drugs, and that medical personnel treating Wiede should know of the possibility that Wiede was under the influence of drugs, we limit our consideration to the facts known to the officer, not his subjective conclusions. *See Johnson*, 722 S.W.2d at 419. McGuairt did not inform the medical personnel of the possibility Wiede was intoxicated, did not tell anyone else to tell them, and did not know whether anyone told them. There is also no evidence that the unidentified officer who conducted the search shared these concerns, that the emergency medical personnel believed Wiede was intoxicated and asked officers to look for drugs in the vehicle, or that Wiede's demeanor or the appearance of his car suggested he was under the influence of any controlled substance. The fact that there was no attempt to relay the information gained through the search to medical personnel belies the State's assertion that the search was conducted out of concern for Wiede's welfare.[5] *See Provost v. State*, 631 S.W.2d 173, 175 (Tex.App.-Houston [1st Dist.] 1981, pet. ref'd) (search of home was not justified out of concern for fire inside when police first called the district attorney and delayed entry until after fire department had extinguished fire).

The dissent contends that the search of Wiede's car was conducted incident to the performance of a bona fide community caretaking activity. It claims "[t]here is no ready test for determining reasonableness [of a search] other than by balancing the need to search against the invasion

---

5. The dissent contends that we fail to defer to the trial court's assessment of credibility. However, the trial court could not have made a credibility determination regarding the offi-
cer's motivation for the search because the officer who actually conducted the search was not identified and did not testify.

that the search entails." *See Camara v. Municipal Court,* 387 U.S. 523, 534–35, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (warrant required for administrative search of private dwelling). Citing the dissenting opinion of one judge of the court of criminal appeals, the dissent seeks to determine whether the search of Wiede's car was permissible as community caretaking by balancing the public interest furthered by the search against Wiede's right to privacy in his vehicle. *See Wright,* 7 S.W.3d at 155 (Meyers, J., dissenting). Although these interests are balanced in examining whether a search is justified under a community caretaking exception, we do not do so on an *ad hoc* basis. This delicate balance is reflected in the standards set forth in the "few specifically established and well-delineated exceptions" to the Fourth Amendment's general requirements of a warrant and probable cause. *Mincey v. Arizona,* 437 U.S. 385, 390, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Furthermore, Judge Meyers presented his balancing approach as an alternative to the majority opinion's "totality of the circumstances" test which established the *Wright* factors discussed above. *See Wright v. State,* 7 S.W.3d at 153. We therefore presume that the court of criminal appeals considered and specifically rejected establishing such a standard in community caretaking cases.

■ In the context of reviewing a search under the emergency doctrine we must determine whether: (1) the officer's actions were totally divorced from the detection, investigation, or acquisition of evidence, (2) there was an immediate, objectively reasonable belief that the search is necessary in order to protect or preserve life or avoid serious injury, and (3) the scope of the search was strictly circumscribed by the facts of the emergency.

*See Laney,* 117 S.W.3d at 861–62; *Gonzalez,* 148 S.W.3d at 708. Although the dissent states that the search was incident to the community caretaking function, we find no specific and articulable facts which support that assertion. The methamphetamine was not discovered in plain view while police were in the course of assisting Wiede; he had already been removed from the car. Nor does the record support that the search was part of an investigation of the accident. The officers did not canvas the entire vehicle for information, but only conducted a narrow search for an item that a witness informed them he saw Wiede hide. Nothing in the record indicates that the officers had any reason to believe that the unidentified item had any relationship to the cause of the accident prior to discovering that it was methamphetamine. *See Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (search unlawful at its inception may not be validated by what it turns up); *Carver v. State,* 746 S.W.2d 869, 872 (Tex.App.-Houston [14th Dist.] 1988, pet. ref'd) (search "must be justified by what is known to police officers at the inception of the search and cannot be justified by evidence seized as a result of the search or arrest"). At best, the officers could only speculate that the hidden item was relevant to their legitimate community caretaking function. *See Janicek v. State,* 634 S.W.2d 687, 691 n. 11 (Tex.Crim.App.1982) (intrusions upon fourth amendment right to privacy to be determined "by the facts, not by rumor, suspicion, or guesswork"). Considering the totality of the circumstances, the record does not support a conclusion that the officer's search of Wiede's car was (1) totally divorced from the detection, investigation, or acquisition of evidence or that (2) there was an immediate, objectively reasonable belief that the search was necessary in order to protect or preserve life or avoid serious injury.

*See Laney,* 117 S.W.3d at 861–62; *Gonzalez,* 148 S.W.3d at 708. The mere fact that Wiede was in a traffic accident and made a furtive gesture, absent any evidence indicating that he was under the influence of a drug, does not support a finding that the search was justified under the emergency doctrine. *See Laney,* 117 S.W.3d at 860; *Wright,* 18 S.W.3d at 247 (reasons given for stop were unreasonably speculative and appear to be an attempt to justify stop in hindsight).

The record also does not support the view that this search was permissible under the distinct *Cady* community caretaking exception. In *Cady,* the United States Supreme Court acknowledged that local police "frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady,* 413 U.S. at 441, 93 S.Ct. 2523. The court of criminal appeals distinguished the *Cady* doctrine from the closely related emergency community caretaking doctrine because the *Cady* doctrine (1) does not require an officer to be acting only to preserve or protect life or avoid serious injury and (2) applies primarily to searches and seizures of vehicles. *Laney,* 117 S.W.3d at 861.

In *Cady,* an intoxicated police officer was involved in a car accident in another jurisdiction and lapsed into a coma. 413 U.S. at 435–36, 93 S.Ct. 2523. Police towed his car to an unguarded private garage and later searched the car looking for the service revolver they believed the injured officer was required to carry; the searchers instead discovered evidence of a murder committed by the injured officer. *Id.* at 436–37, 93 S.Ct. 2523. The Supreme Court held that, where the trunk of an automobile reasonably believed to contain a gun was vulnerable to intrusion by vandals, the search was not unreasonable within the meaning of the Fourth and Fourteenth Amendments. *Id.* at 448, 93 S.Ct. 2523.

■■■■ The search of Wiede's vehicle is easily distinguishable from *Cady.* As we noted earlier in this opinion, the record does not support the conclusion that the narrow search of only one area in the vehicle was "totally divorced from the detection, investigation, or acquisition of evidence." *See id.* at 441, 93 S.Ct. 2523. Even if a search for drugs was permissible, the officer's belief that the Wiede's vehicle contained drugs was, at best, speculative. Furthermore, the fear that a small quantity of drugs may remain hidden in an unguarded car does not raise the same concerns for public safety that motivated the officers in *Cady* to search for a gun.[6] We therefore reject the contention of the State and the dissent that the search of Wiede's vehicle was justified under the officers' community caretaking function.

Because the State did not establish that there was either probable cause to support the search of Wiede's vehicle, or that the

---

**6.** The dissent attempts to expand the *Cady* exception by engaging in a balancing test between Wiede's privacy interest and the interest in the search. No court has characterized the *Cady* exception as a simple, case-by-case balancing test and we decline to do so. Nor does the *Cady* exception provide a general authority to search a vehicle involved in a traffic accident. Although police have a duty to respond to a traffic accident, render aid, and investigate its cause, the *Cady* doctrine only applies to those police actions that are in furtherance of the legitimate community caretaking function and "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady,* 413 U.S. at 441, 93 S.Ct. 2523.

search was justified under an exception to the Fourth Amendment's probable cause requirement, we hold that the trial court abused its discretion by admitting the methamphetamine into evidence. The admission of the methamphetamine undoubtedly contributed to the decision to revoke Wiede's probation. The error in its admission was thus harmful.

Wiede asserts, the State concedes, and we agree that the district court erred by revoking Wiede's probation for failure to pay fines and fees because the State waived those grounds.

Because the remaining issue concerning inadequate proof of the chain of custody of the methamphetamine would not require any greater relief, we need not address it.

### CONCLUSION

The court erred by admitting the methamphetamine into evidence. The court also erred by revoking Wiede's probation for failure to pay fines and fees because the State waived those grounds. Accordingly, we reverse the district court's order revoking Wiede's probation and remand the cause for further proceedings not inconsistent with this opinion.

Dissenting Opinion by Justice PATTERSON.

JAN P. PATTERSON, Justice, dissenting.

This is a probation revocation case. After a hearing on the State's motion to revoke probation, the trial court found that appellant committed the offense of possession of a controlled substance in violation of his probationary conditions, and revoked his probation. Law enforcement officers had discovered methamphetamine near the driver's seat of appellant's car as they investigated appellant's collision with an 18–wheeler truck on a public highway.

The question presented is whether the trial court abused its discretion in finding that the officers at the scene of the accident had a legitimate reason to investigate the accident and were performing a community caretaking function when they discovered the methamphetamine. Based on applying the proper standard of review, I would affirm the district court's judgment. Because the majority failed to adhere to the standard of review, I dissent.

### I.

At the hearing on the State's motion to revoke, DPS trooper Christopher McGuairt testified that he came upon the accident scene shortly after 7:00 a.m. on April 17, 2002, as he was traveling from Austin to San Marcos with another trooper to conduct a DPS training exercise for new officers. The officers called in the accident and began directing traffic. Roy Tambunga, a teacher with the Austin Independent School District who witnessed the accident, informed the officers that appellant had collided with the back of an 18–wheeler truck that continued on down the highway after the collision. Based on Tambunga's description of the truck, Officer McGuairt caught up with the driver who returned to the scene. Appellant was badly injured with cuts and abrasions, and a lot of blood was on his face and clothing. McGuairt could not discern the full extent of appellant's injuries, but testified that he was concerned about appellant's health and also that he thought appellant might be under the influence of some type of drug.

Tambunga testified at the hearing that, when he arrived at appellant's car immediately after the accident, he reached into the car, turned off the ignition and remained next to appellant's car window, talking to him and asking if he was all right. There, Tambunga observed that

despite severe injuries, appellant had the presence to keep looking back at him. Concerned that appellant might light a cigarette, Tambunga leaned in closer to see what appellant was doing. Appellant's hand was cupped around an object, which he then moved with his left hand toward the area between the console and the driver's seat.

McGuairt testified that Tambunga told the officers that he observed appellant "remove something from his pocket and place it near the console area." Tambunga testified that he told the troopers: "You may want to check the seat, because he was messing around with something there." McGuairt observed another officer then reach into the car and remove a plastic baggy from between the seat and the console.[1] Tambunga's unobstructed view of appellant's previous actions was clear enough that when the officer first reached in and "pulled a little square piece of plastic out," which was ripped open and empty, Tambunga told the officer that the object he had observed in appellant's hand was larger. The officer then pulled from the seat a second object—a sandwich-bag sized plastic wrapper containing a powdery substance—that Tambunga confirmed as the object he had seen. Another officer recorded the baggy of white powder on a property inventory form and took photographs of the accident scene as well as the interior and exterior of the vehicle. Officer McGuairt began to fill out the accident report form, "getting information from the vehicle."

## II.

At the hearing on the State's motion to revoke probation, the State argued, *inter alia,* that because the officers were legitimately at the accident scene to assist an injured motorist, direct traffic, and investigate an accident, that the community caretaking exception to the warrant requirement applied to the seizure of the drugs from the car. The trial court admitted the evidence and made the following oral findings:

> It's my opinion that this community caretaker—and probably when the officer's got a legitimate reason to be there, he has no reason to suspect criminal activity. But he's at the scene of an accident where someone rear-ended somebody and someone tells him they're concealing something in the console. That's enough to find out what was in the console when the man's taken by ambulance, whether it be community caretaker or whatever.

> \* \* \*

> What I've done is I've limited it down to the reasons it gets in is because of the community caretaker. And then the officer at the scene, he's got a legitimate reason to be there. And then he has a reason, from a source, to look where the person told him there might be something concealed, whether it be a weapon or whatever. So I limited it to two items.

After hearing additional evidence, including (i) testimony from a former sister-in-law who claimed that she had borrowed the car and that the drugs belonged to her and not appellant, and (ii) appellant's testimony that he left the car unlocked and had also loaned it to his former sister-in-law, the trial court found the State's allegation in its motion to be true and revoked appellant's probation.

---

1. Although the sequence of events is not entirely clear from the record, it appears that appellant had been removed to an ambulance at the time the officers reached for the object.

### III.

It is important to note what this case is not about. It does not involve a traffic stop or any type of invasive citizen-police encounter with an occupant of a parked or moving automobile. *See, e.g., Wyoming v. Houghton,* 526 U.S. 295, 298, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999); *New York v. Class,* 475 U.S. 106, 108–10, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986); *United States v. Brigham,* 382 F.3d 500, 504 (5th Cir.2004). Appellant's case is distinguishable from those in which a citizen is pulled over for a minor traffic violation and then searched under the guise of the community caretaking exception. *See, e.g., Corbin v. State,* 85 S.W.3d 272, 274–75 (Tex.Crim.App.2002). In a much different series of events, appellant was badly injured, was "extracted" from the automobile and was then taken to the hospital. Even with the suspicion that he might be under the influence of some substance, the record reflects that he was not stopped, questioned, arrested, or detained in any manner. Nor does appellant claim that the officers conducted some generalized search, seeking evidence of unspecified crimes. Rather, the evidence is clear that the officers—en route to other duties—stopped solely to come to his aid and perform bona fide public safety functions. And the trial court so found. The only issue on review then is whether it was proper for the trial court to overrule appellant's objections to the admission of the drug evidence found at the scene of the accident and to exercise its discretion in revoking appellant's probation.

Proper appellate review begins with an analysis of the standard of review. The relevant standard bears repetition here. Our standard of review is highly deferential to the trial court's findings of historical facts that the record supports, especially when the trial court's fact findings are based upon an evaluation of credibility and demeanor. *State v. Ross,* 32 S.W.3d 853, 856 (Tex.Crim.App.2000). We review *de novo* mixed questions of law and fact that do not turn on an evaluation of credibility and demeanor. *Laney v. State,* 117 S.W.3d 854, 857 (Tex.Crim.App.2003). And we sustain the trial court's ruling admitting the evidence if it is correct on any theory of law that finds support in the record, even if the trial judge gives the wrong reason for the decision. *Id.; Osbourn v. State,* 92 S.W.3d 531, 538 (Tex. Crim.App.2002); *Ross,* 32 S.W.3d at 855–56; *see also Willover v. State,* 70 S.W.3d 841, 845 (Tex.Crim.App.2002).

When a defendant appeals from a probation revocation hearing, the only question for review is whether the trial court abused its discretion in revoking the defendant's probation. *Bradley v. State,* 564 S.W.2d 727, 729 (Tex.Crim.App.1978). In determining whether an abuse of discretion occurred, we review the evidence adduced at the revocation hearing in the light most favorable to the trial court's order. *Jones v. State,* 589 S.W.2d 419, 421 (Tex. Crim.App.1979). At a probation revocation hearing, the trial court is the sole trier of fact and determines the credibility of the witnesses. *Ex parte Tarver,* 725 S.W.2d 195, 198 (Tex.Crim.App.1986). The trial court must find that the State satisfied its burden of showing that "the greater weight of the credible evidence ... creates a reasonable belief that a condition of probation" was violated, and has "proved every element of the offense by a preponderance of the evidence." *Kulhanek v. State,* 587 S.W.2d 424, 426 (Tex. Crim.App.1979).

### IV.

The Supreme Court first recognized a community caretaking function of law enforcement as an exception to the Fourth Amendment's warrant requirement in *Cady v. Dombrowski,* a case expressly ref-

erenced and relied upon by the trial judge here in making his findings. 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). In *Cady*—as here—the police were simply responding to a traffic accident. *Id.* at 436, 93 S.Ct. 2523. Because the defendant in *Cady* was an off-duty police officer thought to be carrying a service revolver, one of the responding officers looked in the front seat and glove compartment for the revolver at the scene of the accident. Finding no revolver, the police then summoned a tow truck to remove the disabled vehicle. A wrecker arrived and towed the vehicle to a privately owned garage. It was undisputed that the vehicle was no longer in police control after it was towed. The defendant was arrested for drunken driving and, after questioning, taken to a hospital for unspecified injuries sustained in the accident. *Id.* Several hours later, one of the officers drove to the private garage where the vehicle had been towed and searched it more thoroughly for the revolver. Between the two front seats and in the trunk, the officer found evidence of a murder. *Id.* at 437, 93 S.Ct. 2523.

Drawing a distinction between dwelling places and motor vehicles, the Court in *Cady* concluded that this type of caretaking search—conducted on a vehicle that was neither in the custody of, nor on the premises of, its owner, and that was relocated by virtue of lawful police action—was not unreasonable simply because the officers had not obtained a warrant. *Id.* at 441, 93 S.Ct. 2523. Recognizing that local police officers, as opposed to federal officers, have frequent regulatory contact with automobiles relating to the operation of vehicles themselves, the Court stated:

> Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

*Id.* The Court concluded that the search was constitutionally reasonable and that no warrant was required. *Id.* at 447, 93 S.Ct. 2523.

Searches of automobiles have historically been treated as being constitutionally different than searches of private dwellings. Courts have long recognized that the physical characteristics and uses of an automobile result in a lessened expectation of privacy. *See, e.g., Houghton,* 526 U.S. at 303, 119 S.Ct. 1297; *Class,* 475 U.S. at 113, 106 S.Ct. 960; *South Dakota v. Opperman,* 428 U.S. 364, 382, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). Indeed, an automobile exception to the Fourth Amendment's warrant requirement, allowing officers to search vehicles without first obtaining a warrant in limited situations, has long been recognized by the Supreme Court. *See Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Warrantless examinations of automobiles have been upheld in circumstances in which a search of a home or office would not. *Opperman,* 428 U.S. at 382, 96 S.Ct. 3092; *Cardwell v. Lewis,* 417 U.S. 583, 589, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974); *Cady,* 413 U.S. at 439–40, 93 S.Ct. 2523; *Chambers v. Maroney,* 399

U.S. 42, 48, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

This exception is due to both the inherent mobility of vehicles as well as the reduced expectation of privacy attached to vehicles. *California v. Carney,* 471 U.S. 386, 391–92, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985). Courts have recognized that the inherent mobility of automobiles creates circumstances of exigency that make enforcement of the warrant requirement impossible. *Opperman,* 428 U.S. at 367, 96 S.Ct. 3092; *Carroll,* 267 U.S. at 153–54, 45 S.Ct. 280; *Robertson v. State,* 541 S.W.2d 608, 610 (Tex.Crim.App.1976). And courts have repeatedly found that the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office. In *Camara v. Municipal Court* and *See v. City of Seattle,* the Court held that a warrant was required for an administrative agency to conduct health and safety inspections of private dwellings or commercial premises, unless consent was obtained prior to the search. 387 U.S. 523, 534, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (holding that individual interests protected by Fourth Amendment were not outweighed by public purpose search may serve); 387 U.S. 541, 545, 87 S.Ct. 1741, 18 L.Ed.2d 930 (1967). In contrast, this procedure has never been held applicable to automobile inspections for safety purposes.

This reduced expectation of privacy as to automobiles is further diminished by the public nature of automobile travel. In *Cardwell v. Lewis,* the Court observed that:

> One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view.

417 U.S. 583, 590, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974). The Court has also recognized that, "as an everyday occurrence," vehicles are subjected to police stops and examinations to enforce pervasive governmental regulations, *Opperman,* 428 U.S. at 368, 96 S.Ct. 3092, and are "exposed to traffic accidents that may render all their contents open to public scrutiny." *Houghton,* 526 U.S. at 303, 119 S.Ct. 1297. While searches of one's person, home or business surely constitute "an annoying, frightening, and perhaps humiliating experience," these traumatic consequences are not necessarily associated with vehicle searches. *Terry v. Ohio,* 392 U.S. 1, 24–25, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Recognizing still that drivers do not relinquish the protections afforded by the Fourth Amendment and the right of individuals to be free of unreasonable governmental intrusion, in *Cardwell v. Lewis* the Supreme Court observed that "insofar as the Fourth Amendment protection extends to a motor vehicle, it is the right to privacy that is the touchstone" of the inquiry. 417 U.S. at 591, 94 S.Ct. 2464.

It is this touchstone then that prohibits "unreasonable" searches and seizures. There is no ready test for determining reasonableness other than by balancing the need to search against the invasion that the search entails. *Camara,* 387 U.S. at 534–35, 87 S.Ct. 1727. The police officer must be able to point to specific and articulable facts that, when taken together with rational inferences from those facts, justify the particular intrusion. *Terry,* 392 U.S. at 21, 88 S.Ct. 1868.

## V.

Drawing on *Cady* and its progeny, Texas courts have also recognized the ex-

istence of the community caretaking function, but emphasized its narrow applicability.[2] After referencing the community caretaking function in *Robertson*, 541 S.W.2d at 611, the Texas Court of Criminal Appeals recognized the community caretaking function of law enforcement as an exception to the Fourth Amendment's warrant requirement in *Wright v. State*, a case remanded to this Court for application of the factors formulated by the higher court's opinion. 7 S.W.3d 148, 153 (Tex.Crim.App.1999).

In *Wright*, the court of criminal appeals addressed the issue of whether a deputy acted reasonably in stopping a vehicle out of concern for the defendant's welfare, after the officer observed the defendant, a passenger, retch out of an open rear window. *Id.* at 150. In its opinion, the court made clear that the proper inquiry is whether the police officer acted reasonably under the totality of circumstances to render services in performing his duty to "serve and protect." *Id.* at 151. As to whether the police officer acted reasonably, the court set forth four nonexclusive factors: (1) the nature and level of the distress exhibited by the individual; (2) the location of the individual; (3) whether or not the individual was alone and/or had access to assistance independent of that offered by the officer; and (4) to what extent the individual—if not assisted—presented a danger to himself or others. *Id.* at 152. The record demonstrates that appellant was seriously injured, located at the scene of an automobile collision, and in need of medical attention. Although medical personnel were present, the officer's search offered independent assistance based on the possibility that appellant's treatment would be affected by his findings. Based on Tambunga's tip, the officer could infer that the information was relevant to the existing circumstances—either the accident investigation or appellant's medical treatment. Given these facts, the officers' actions were justified under the *Wright* four-factor test.

The *Wright* dissent by Judge Meyers formulated the test as follows:

> Whether or not a given stop is reasonable "depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." In measuring the weight of the public interest, the first step involves an inquiry into whether the officer was performing a bona fide community caretaking or public safety function. In other words, a court should examine whether the purpose expressed by the officer for the stop is consistent with his legitimate role as community caretaker. Furthermore, the officer's proffered justification must be supported by "specific and articulable facts."

*Id.* at 155 (Meyers, J., dissenting) (internal citations omitted).

Here, by either test, the trial court had a basis for finding that the State established a bona fide caretaking function. The officers' actions were reasonable and consistent with their legitimate roles as community caretakers. That the officers had a legitimate reason to investigate the accident is undisputed. The Texas Legislature has provided that "[a] peace officer who is notified of a motor vehicle accident resulting in injury [on a highway] . . . may

---

2. But the "narrow applicability" is not as the majority would confine it. In finding the application of the doctrine "narrow," the court of criminal appeals specifically admonished that only in the most unusual circumstances would the community caretaking function extend to warrantless searches of "private, fixed property, or stops of persons located thereon." *Wright v. State*, 7 S.W.3d 148, 152 (Tex.Crim.App.1999).

investigate the accident and file justifiable charges relating to the accident." Tex. Transp. Code Ann. § 550.041(a) (West 1999 & Supp.2004–05).[3] Indeed, Texas peace officers are charged with public safety duties that extend beyond crime detection and investigation. *See Wright,* 7 S.W.3d at 154 (Meyers, J., dissenting). The investigation at the scene performs an important and routine administrative purpose.[4]

Here, the justification was supported by specific and articulable facts. As Officer McGuairt testified and the court recognized, the officers wore several hats and performed various functions of local law enforcement officers arriving at the scene of the accident. DPS Trooper Freeman testified that he took photographs and recorded "the names of the people involved in the accident, the directions of travel, matching up the damage to each vehicle, looking at who possibly was at fault at the accident and trying to make a decision." He further testified that they cleared the site so that traffic could get through, that they took custody of the vehicle, and had it inventoried and towed. Officer McGuairt testified that the troopers were working the accident scene until the assigned trooper arrived, and that they were obtaining "pertinent information relating to the accident." And the trial court so found.[5]

Experience unfortunately teaches us that an accident scene on a public highway is often chaotic. Investigators who arrive at the scene shortly thereafter are called upon to make immediate judgment calls. Even as they are monitoring their own safety and that of other motorists, the officers must assess the injuries of those involved, summon emergency vehicles, direct traffic, measure and photograph the scene, determine whether and when vehicles may be safely moved, determine whether to tow and/or impound vehicles, and investigate the cause of the accident. As found by the trial court, the officers here were performing a bona fide caretaker activity. Any incursion was incident to this function. Absent ruse, pretext, or subterfuge on the part of the officers to rummage for evidence for a criminal proceeding, and in light of the findings of the trial court, I would find that the officers acted reasonably.

Moreover, the privacy interest at stake here was minimal because appellant had already been removed from the car and the demolished vehicle was under control of the officers. As in *Cady,* the officers here were responding to a specific and narrowly articulated tip. *See* 413 U.S. at 436, 93 S.Ct. 2523. Based on the specificity of the "tip" from Tambunga, the citizen-bystander-witness, it was reasonable for the officer to follow up on the information.

---

**3.** A law enforcement officer who in the regular course of duty investigates a motor vehicle accident is also obligated to submit a written report of the accident. Tex. Transp. Code Ann. § 550.062 (West 1999 & Supp.2004–05).

**4.** The investigation of an accident scene is akin to that of firemen arriving at the scene of a burning building. *See Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978). In *Michigan v. Tyler,* in upholding the warrantless entry and re-entry of premises to determine the cause of a fire, the Court recognized that fire officials are charged not only with extinguishing fires, but also with

finding their causes. The Court observed: "Immediate investigation may also be necessary to preserve evidence from intentional or accidental destruction." *Id.* at 510, 98 S.Ct. 1942. The Court then recognized that it was necessary for the officials to remain in the building a "reasonable" time "pursuing their duty both to extinguish the fire and to ascertain its origin." *Id.*

**5.** In *Michigan v. Tyler,* the fire chief testified that their job was to respond to the fire and "to determine its cause and make out all reports." *Id.* at 501, 98 S.Ct. 1942.

That appellant used his unbroken arm to remove an object from his pocket and place it between his seat and the console was information that the officers could not ignore in order to perform their duties. The officer conducted a limited search of the suspected area: He reached into the identified space of appellant's car and retrieved a plastic baggy. After Tambunga stated it was not the correct object, the officer retrieved a larger baggy filled with a powdery substance, later identified as 1.76 grams of methamphetamine. Tambunga confirmed this was the same object he saw appellant attempt to conceal.

What is also clear from the record is that Tambunga thought the information he imparted to the troopers was significant to their task at hand. Whether the object he observed was medicine appellant might need or evidence of a crime, Tambunga thought it was relevant to the officers' performance of their duties. The officers followed up only on the specific, articulated information provided by the bystander witness, and the trial court found their actions to be objectively reasonable. It would not have been reasonable for the officers to ignore the information. The most prudent and constitutionally valid course, under these circumstances, was the one taken.

More recently, in *Laney v. State*, the court of criminal appeals expanded its analysis of the community caretaking function to examine its application to the warrantless entry and search of a private residence. 117 S.W.3d 854. In that case, police officers were investigating a disturbance involving Laney when they noticed two young boys exit his darkened trailer onto the front porch. When Laney acknowledged that the children were not his and the boys re-entered the trailer, one of the officers asked Laney if he had ever been arrested. Laney responded that he had been arrested for indecency with a child. An officer entered the trailer to retrieve the children. At the suppression hearing, the officer testified that because Laney had been detained and was possibly going to jail, it was his responsibility to get the children out of the trailer and find out who their parents were. Once inside the trailer, the officer observed pornographic material involving young boys. He did not touch the materials, but reported the items to detectives who "obtained appellant's consent" to search the trailer. *Id.* at 856.

Applying the emergency doctrine and finding exigent circumstances—but no immediate threat to the children's safety or well-being—the court upheld the warrantless entry. *Id.* at 863. The court found that there was an immediate, objectively reasonable belief on the officer's part that he needed to act to protect the life of one of the children and prevent him from incurring serious injury. *Id.* Importantly, the court also noted that the search was strictly circumscribed by the exigencies that justified the entry. *Id.* Because one of the boys had appeared at the door and told the officer where he could find the second child, the officer proceeded directly to where the first boy told him the second boy could be found; the officer located the child, did not expand the search, and immediately exited the trailer. *Id.* Based on those circumstances, the court found that the emergency doctrine applied. *Id.*

Distinguishing between three types of functions, all identified under the rubric of community caretaking, the *Laney* court recognized the emergency aid doctrine, the automobile impoundment and inventory doctrine, and the community caretaking or public servant doctrine. *Id.* at 860. "The common thread in each of the three exceptions to the warrant and probable cause requirements is the officer's purpose." *Id.* But the court went on to distinguish the emergency doctrine from the "public serv-

ant" doctrine. "[W]hile both doctrines are based on an officer's reasonable belief in the need to act pursuant to his or her 'community caretaking functions,' the emergency doctrine is limited to the functions of protecting or preserving life or avoiding serious injury," and primarily "deals with warrantless entries of . . . private residences." *Id.* at 861. The public servant or *Cady* doctrine "deals primarily with warrantless searches and seizures of automobiles (and will be limited to those circumstances except in unusual circumstances). . . ." *Id.; see also Wright,* 7 S.W.3d at 152 n. 7 (stating that the emergency doctrine is similar to the community caretaking function, except that it applies to residences, rather than vehicles). Thus, the *Cady* rationale, which supported the search of an impounded vehicle for a missing pistol, also supports an officer's legitimate role as a public servant with a duty to assist those in distress and maintain and foster public safety on the public highways. *See* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706.

While the facts in *Cady, Wright* and *Laney* differ in significant respects from those at hand, the factors supporting a finding that the officers were engaging in their community caretaking function were all present here: The officers were conducting legitimate caretaking functions, they were assisting a motorist in distress and in immediate need, and the intrusion was minimal and narrowly circumscribed. The caretaking function was their primary motivation. The search was focused in its objective and it was no more intrusive than necessary to fulfill that objective. Certainly, it was less intrusive for the officer to search appellant's front seat than it would have been for him to pat-down the appellant, or to search the area within appellant's immediate control, or to arrest the appellant. It is difficult to imagine a situation with a more minimal privacy interest than here: The vehicle was immobilized, inoperable, under lawful police control and then impounded by a private towing company, and the driver had been injured and removed from the scene by an ambulance. In these circumstances, the State's interest in rendering aid and performing its administrative functions outweighs appellant's eclipsed privacy interests.[6]

The trial court also concluded that the evidence did not support a proper inventory search. I agree. In the absence of a warrant, the State carries the burden of proving that its search was constitutionally reasonable under some exception to the warrant requirement; proof that the officers followed standardized procedures in conducting an inventory search of an impounded vehicle, or one under their control, is one way to satisfy this burden. *Opperman,* 428 U.S. at 373, 96 S.Ct. 3092. Here, the State did not carry its burden in demonstrating that the officers employed a standardized inventory procedure. The inventory form was unsigned and incom-

---

6. "When balancing the competing interests, our determinations of 'reasonableness' under the Fourth Amendment must take account of these practical realities. We think they militate in favor of the needs of law enforcement, and against a personal-privacy interest that is ordinarily weak." *Wyoming v. Houghton,* 526 U.S. 295, 306, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999). In assessing reasonableness under the Fourth Amendment in a recent traffic-stop case, the Texas Court of Criminal Appeals viewed the totality of the circumstances in the light most favorable to the trial court's factual findings, concluding that it does not require a "single, formulaic approach," "nor does it require rigid adherence to the 'least intrusive means' of investigation defined by Monday-morning reviewing courts." *Kothe v. State,* 152 S.W.3d 54 (2004) (quoting *United States v. Brigham,* 382 F.3d 500, 511 (5th Cir.2004)).

plete, and the officer who was charged with its execution did not testify.

But the impoundment is relevant to our analysis for a separate reason. It is undisputed that appellant's vehicle was lawfully impounded. The manner of impoundment supports the State's argument that the officers were performing a caretaking function. Trooper Freeman testified that they took custody of the vehicle and had it towed to an impound lot, but "we didn't put a hold on the vehicle." That they did not conduct a general search at the scene and that the car was impounded but not searched and was later released to appellant's friend is consistent with the officers' testimony that they merely conducted the accident investigation authorized by statute.

Applying the objective standard of reasonableness in determining whether the search is justified under the *Cady* doctrine, I would find that the trial court did not abuse its discretion in revoking appellant's probation for committing the offense of possession of methamphetamine. I would affirm the judgment of the trial court.