EDITH H. JONES, Circuit Judge:
During a traffic stop near Nacogdoches, Texas, routine questioning of the occupants and a consensual search uncovered over five kilograms of a controlled substance, liquid codeine syrup. The district court denied the appellant’s motion to suppress. We granted en banc review of a divided panel decision that reversed the district court and held that the traffic stop was unconstitutionally extended and that the consensual search was improper. Clarifying prior precedents regarding the proper application of the Fourth Amendment in traffic stop cases, we hold that the state trooper’s investigatory procedures in this case were eminently reasonable under the totality of the circumstances. The conviction is AFFIRMED.
*504 I. BACKGROUND

A. The Traffic Stop

[1]

On May 14, 2000, Reginald Brigham and three friends were driving on U.S. Highway 59 passing around Nacogdoches, Texas. At 4:13 p.m., State Trooper Shannon Conklin spotted their silver 2000 Buick sedan following too closely behind another vehicle in violation of Texas traffic laws. Conklin stopped the Buick; a videocamera and microphone mounted in the patrol car recorded the entire traffic stop.
Conklin first approached Brigham, the driver, and asked him to step out of the vehicle and provide his license and insurance papers. Brigham complied and produced an Arkansas driver’s license and a rental agreement from an Avis branch in Memphis, Tennessee, listing Dorothy Harris, a 50-year-old female who lived in West Memphis, Arkansas, as the lessee. Since none of the occupants appeared to be a 50-year old female, and no additional drivers were authorized on the rental agreement, Conklin became suspicious.
At 4:15 p.m., two minutes into the stop, Conklin began asking Brigham a series of basic questions about the group’s travel plans. Brigham replied that they were coming from Houston, Texas, that one of the passengers had been visiting family members, and that the rest of the group was on vacation. Conklin asked where the group had stayed and Brigham replied that they had stayed in a La Quinta Inn, but he had difficulty explaining where the motel was located. Brigham avoided making eye contact with Conklin, appeared to be extremely nervous, and was responding to Conklin’s questions with questions of his own. Conklin’s five and one-half years of experience with the Texas Department of Public Safety led him to believe that Brigham was fabricating answers to his questions. Brigham identified Dorothy Harris, the renter of the car, as his mother. Bothered by Brigham’s demeanor and answers, Conklin decided to verify Brigham’s story with the other occupants of the car.
At 4:17 p.m., Conklin asked the passenger who Brigham had indicated was visiting relatives in Houston to step out of the vehicle. The passenger produced what appeared to be a Tennessee I.D. card with the name “Sircrease D. Brooks.” Conklin would soon discover that the I.D. was fictitious and that the passenger’s name was actually Brandon Franklin. Conklin questioned Franklin about the group’s travel plans. Franklin explained that the group was coming from Houston where they had attended an Isley Brothers concert on Friday night. Conklin then asked Franklin about the specifics of the trip, including what time the group had arrived in Houston, whom they had visited, and where they stayed. Franklin appeared somewhat confused about the exact time the group had arrived in Houston, first answering Friday evening but then saying he wasn’t sure when they arrived. FranHin also mentioned a La Quinta Inn and added that he knew a “couple of girls” in Houston. Notably, Franklin did not state either that he had any relatives in the Houston area or that he was visiting his family. Like Brigham, Franklin avoided eye contact with Conklin and appeared extremely nervous.
At 4:20 p.m., Conklin asked the two remaining passengers for identification and attempted to determine which of the stories he had been told was accurate. The female, Keisha Coleman, indicated that she did not have any identification, and the other male produced an Arkansas card identifying him as Quincy Perry. Perry and Coleman appeared confused and *505 were inconsistent concerning the group’s travel plans, as Perry initially stated that they arrived in Houston on Friday morning, while Coleman suggested Saturday.
At 4:21 p.m., now eight minutes into the stop, Conklin returned to his car and initiated computer checks on the Buick and the three identification cards he had received. He noted for the videotape that all three males appeared “extremely nervous.” Nevertheless, Conklin had informed Brigham that if his license was “clean,” they would soon be on their way. At 4:23 p.m., the registration check on the Buick revealed that the plates matched the vehicle and there was no stolen vehicle report. At the suppression hearing, Conklin testified that he remained suspicious because in his experience, the fact that a car is not yet reported as stolen does not necessarily indicate that the car was not actually stolen. As he awaited the results of the I.D. checks, Conklin continued to make verbal notes about the Buick’s occupants, stressing that Brigham and Franklin avoided eye contact with him, all three men appeared extremely nervous, their hands were shaking, and the occupants’ stories about their arrival time in Houston and the purpose of their visit were in conflict. In addition, Conklin observed that none of the subjects was 25 years old, consequently, none of them appeared to have the authority legally to possess the rental car.
At 4:29 p.m., the results of the I.D. checks suggested that Franklin’s I.D. was likely fictitious. After confirming the I.D. number that he had provided to the dispatcher, Conklin examined Franklin’s I.D. more closely and concluded it was a forgery. At approximately 4:31 p.m., Conklin questioned Brigham and learned Franklin’s true identity. Franklin, however, continued to insist to Conklin that he was “Sircrease Brooks,” until Conklin confronted him about the false I.D. card. Conklin then returned to his patrol car to check Franklin’s actual identity.
At approximately 4:34 p.m., while Franklin’s I.D. check was still pending, Conklin waved over a Nacogdoches police unit to provide backup and briefed the officers on the situation and his intent to seek consent to search the vehicle. Conk-lin then provided Brigham with a written warning for following too closely and returned Brigham’s driver’s license, while explaining that one of his responsibilities as a state trooper was to intercept illegal contraband such as guns, stolen property, and narcotics. Brigham denied that any illegal items were in the car and acceded to Conklin’s request for a search. Conklin first removed all of the passengers from the car and patted them down. While Conklin was searching the Buick, the dispatcher responded with additional information regarding Franklin’s identity. At approximately 4:42 p.m., Conklin discovered in the trunk, inside a cooler, a Minute Maid juice container holding what appeared to be liquid codeine. Conklin then arrested all four occupants of the Buick. Lab tests later confirmed that the substance was liquid codeine syrup.

B. Court Proceedings

On January 11, 2001, Brigham, Franklin, and Perry were indicted by a federal grand jury for possessing more than four kilograms of codeine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Brigham moved unsuccessfully to suppress the evidence discovered during Trooper Conklin’s search on the grounds that the stop and search exceeded the bounds of the Fourth Amendment. Brigham then reached a plea agreement, subject to his right to appeal the denial of the motion to suppress.
On appeal, the panel majority held that Trooper Conklin unconstitutionally extend *506 ed the traffic stop by questioning Brigham before he began a computer check on the 1.D.’s and the rental car’s registration. See United States v. Brigham, 343 F.3d 490, 497-505 (5th Cir.2003), vacated and reh’g en banc granted by, 350 F.3d 1297 (5th Cir.2003). The panel majority also held that Brigham’s consent to search the vehicle was “involuntary” because it was tainted by the Fourth Amendment violation. Id. at 505-07. The conviction was reversed. On rehearing en banc, we find no Fourth Amendment violation and affirm the conviction.
II. DISCUSSION
Brigham does not here challenge the validity of the initial traffic stop for following too closely.[2] See Terry v. Ohio, 392 U.S. 1, 88, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); see Tex. TRANS. Code § 545.062(a) (Vernon 1999) (“An operator shall, if following another vehicle, maintain an assured clear distance between the two vehicles”). Rather, Brigham argues that Trooper Conklin exceeded the scope of the valid stop and prolonged the occupants’ detention excessively and unconstitutionally when, after determining that neither Brigham nor the other occupants of the rental car were its authorized drivers, Conklin interrogated them about their travel plans and then instituted computerized vehicle and I.D. checks.[3]
The stopping of a vehicle and detention of its occupants constitutes a “seizure” under the Fourth Amendment. This court, following the Supreme Court, has treated routine traffic stops, whether justified by probable cause or a reasonable suspicion of a violation, as Terry stops.[4] See Berkemer v. McCarty, 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984); Pennsylvania v. Mimms, 434 U.S. 106, 109, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977) (per curiam); see e.g., United States v. Dortch, 199 F.3d 193, 198 (5th Cir.1999).
Pursuant to Terry, the legality of police investigatory stops is tested in two parts. Courts first examine whether the officer’s action was justified at its inception, and then inquire whether the officer’s subsequent actions were reasonably related in scope to the circumstances that justified the stop. See Terry, 392 U.S. at 19-20, 88 S.Ct. at 1879. Brigham suggests, *507 and the panel majority agreed, that the Fourth Amendment required Conklin to return to the patrol car immediately after he learned that none of the occupants seemed to be an authorized driver and undertake a registration check to determine whether the Buick had been reported stolen. This approach misunderstands the Supreme Court’s insistence on reasonableness rather than prescriptions for police conduct under the Fourth Amendment and extends this circuit’s precedents too far. The correct analysis requires district courts to consider the facts and circumstances of each ease, giving due regard to the experience and training of the law enforcement officers, to determine whether the actions taken by the officers, including the length of the detention, were reasonable under the circumstances.
The Supreme Court has long held that the “touchstone of Fourth Amendment analysis is reasonableness.” Ohio v. Robinette, 519 U.S. 33, 39, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996) (quoting Florida v. Jimeno, 500 U.S. 248, 250, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991)) (internal quotation marks omitted). Reasonableness requires a balancing of the public interest with an individual’s right to be free from arbitrary intrusions by law enforcement. Mimms, 434 U.S. at 109, 98 S.Ct. at 335. Reasonableness, measured “in objective terms by examining the totality of the circumstances,”' “eschew[s] bright-line rules, instead emphasizing the fact-specific nature of the .,. inquiry.” Robinette, 519 U.S.- at 39, 117 S.Ct. 417; see also Florida v. Royer, 460 U.S. 491, 506, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983) (rejecting “a litmus-paper test” and recognizing that “there will be endless variations in the facts and circumstances” and therefore, “it is unlikely that the courts can reduce to a sentence or a paragraph a rule that will provide unarguable answers to the question whether there has been an unreasonable search or seizure in violation of the Fourth Amendment”). Finally, the Supreme Court has emphasized that courts must allow law enforcement “officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that ‘might well elude an untrained person.’ ” United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 750-51, 151 L.Ed.2d 740 (2002) (quoting United States v. Cortez, 449 U.S. 411, 418, 101 S.Ct. 690, 695, .66 L.Ed.2d 621 (1981)).
Under the second prong of the Terry test, the question before the court is whether Conklin’s actions after he legitimately stopped the Buick were reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop. This is because a detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges. Dortch, 199 F.3d at 200; United States v. Machuca-Barrera, 261 F.3d 425, 434 (5th Cir.2001).
Like other circuits,[5] this court has found no constitutional impediment to *508 a law enforcement officer’s request to examine a driver’s license and vehicle registration or rental papers during a traffic stop and to run a computer check on both. See, e.g., Dortch, 199 F.3d at 198 (citing Shabazz, 993 F.2d at 437). An officer may also ask about the purpose and itinerary of a driver’s trip during the traffic stop. See, e.g., United States v. Gonzalez, 328 F.3d 755, 758-59 (5th Cir.2003). Such questions may efficiently determine whether a traffic violation has taken place, and if so, whether a citation or warning should be issued or an arrest made.[6] All these inquiries are within the scope of investigation attendant to the traffic stop.
But even more important, we “reject any notion that a police officer’s questioning, even on a subject unrelated to the purpose of a routine traffic stop, is itself a Fourth Amendment violation.” Shabazz, 993 F.2d at 436 (emphasis added). “[Detention, not questioning, is the evil at which Terry’s second prong is aimed.” Id. The Fourth Amendment is concerned with ensuring that the scope of a given detention is reasonable under the totality of the circumstances. See United States v. Roberson, 6 F.3d 1088, 1092 (5th Cir.1993). Mere police questioning, without some nonconsensual restraint on one’s liberty, is not a “seizure” or detention. Florida v. Bostick, 501 U.S. 429, 434, 115 5.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991). Indeed, this court has recently noted that a consensual interrogation may follow the end of a valid traffic stop and that such consensual encounters do not implicate Fourth Amendment concerns. United States v. Sanchez-Pena, 336 F.3d 431, 442-43 (5th Cir.2003).
Based on these authorities, Trooper Conklin’s questioning of Brigham and his companions was fully within the scope of the detention justified by the traffic stop, particularly after Conklin ascertained that (1) Brigham was not the owner or lessee of the vehicle, (2) the lessee was not present in the Buick, and (3) Brigham’s and Franklin’s versions of their itinerary conflicted. This court has consistently approved a police officer’s questioning a driver’s travel plans where the driver was not the authorized vehicle lessee or otherwise appeared to lack driving authority.[7] Further, as the Eighth Circuit has noted, the Fourth Amendment permits “[a] police officer [to] undertake similar questioning of the vehicle’s occupants to verify the information provided by the driver.” Linkous, 285 F.3d at 719. Conklin’s increasing suspicion was also fueled by Brigham’s extreme nervousness, his avoidance of eye contact, and his pattern of answering the officer’s questions with questions of his own. Conklin had a right to rely on his experience in concluding that such actions indicate that an individual may be lying.
*509 Finally, this process, from the time Trooper Conklin started questioning Brigham until he returned to his patrol car to check the registration and I.D.’s provided by Brigham and the others, lasted only seven minutes. Conklin’s questioning exemplified a graduated response to emerging facts. We cannot say that Conklin’s actions to this point were anything but reasonable under the circumstances, and they effectuated the purpose of the stop.
Equally within the legitimate scope of the stop were the registration and license checks that Conklin then initiated on the vehicle and its occupants. This procedure would have been permissible even without the additional information he had gleaned, which led to a reasonable suspicion that, at the very least, the vehicle might have been stolen.[8] See Dortch, 199 F.3d at 199. While the dispatcher promptly informed Conklin that the Buick had not been reported stolen, Conklin reasonably waited for the I.D. checks to be completed, because in his experience, the fact that a vehicle has not yet been reported stolen does not necessarily mean that the vehicle has not actually been stolen. The Supreme Court has emphasized the importance of allowing officers to “draw on their own experience and specialized training” to make just such inferences from the facts available to them. See Arvizu, 534 U.S. at 273,122 S.Ct. 744.[9]
Once Conklin learned that Franklin’s I.D. was likely false, Conklin acted reasonably, with further questioning, to uncover Franklin’s true identity and perform a correct background check. It was while the background check on Franklin was in progress that Conklin requested and obtained consent from Brigham to search the vehicle. Thus, as in Shabazz, “[b]ecause [Conklin was] still waiting for the computer check at the time that [he] received consent to search the car, the detention to that point continued to be supported by the facts that justified its initiation.” Shabazz, 993 F.2d at 437.
In sum, Conklin’s actions were reasonable under the circumstances and the detention as a whole was reasonable. As the district court summarized, “[t]he absence of the authorized driver, the inconsistent explanation as to the trip to Houston, and Franklin’s presentation of a fictitious I.D., taken together, justified Trooper Conklin’s continued detention of defendants.”
Because the en banc court reaches a different result than does the dissent, it is useful to explain how our analyses diverge. The dissent, like the panel majority, concludes that under our circuit’s precedent, Conklin unconstitutionally extended the detention of Brigham and his passengers by questioning them about their travel plans before running a computer check on the vehicle’s registration. This conclusion embodies three critical mistakes: a *510 misreading of Fifth Circuit precedent; an improper stopwatch on the length of permissible detention; and an erroneous insistence on “least intrusive means” in the Tem/-stop analysis.
First, the dissent extends three of this court’s traffic stop cases well beyond their facts and reasoning. See Dortch, 195 F.3d at 195-201; Jones, 234 F.3d at 236-43; United States v. Santiago, 310 F.3d 336, 337-42 (5th Cir.2002).[10] In each case, following an initially valid traffic stop, patrol officers obtained negative results on computerized driver’s license and vehicle registration checks but continued to detain the drivers without reasonable suspicion until they received consent to search the cars. This court suppressed evidence of illegal drugs turned up by the searches.[11] The panel and the dissent interpret these cases to support a conclusion that Conklin’s questioning about the occupants’ itinerary was “unrelated” to any stolen rental car issue and unduly prolonged their detention. As a result, the dissent would apply these prior cases to limit the quantity, scope and timing of questions that may be asked during a stop.
With due respect to our colleagues, these cases set up no such inflexible rules. The cases are about timing and sequence: after the computer checks came up “clean,” there remained no reasonable suspicion of wrongdoing by the vehicle occupants. Continued questioning thereafter unconstitutionally prolonged the detentions. See also United States v. Valadez, 267 F.3d 395, 398-99 (5th Cir.2001). Moreover, in Dortch and Jones, the extended detentions were reinforced by the officers’ retention of the suspects’ drivers’ licenses. See Dortch, 199 F.3d at 198; Jones, 234 F.3d at 238. This court has not forbidden questioning that included, inter alia, the drivers’ and passengers’ itinerary as a legitimate investigatory device in the first instance. None of the cases demands a particular series of questions be asked— or not asked — within the scope of a traffic stop, so long as the overall detention is justified by reasonable suspicion. Moreover, none of these cases implies that questions about the occupants’ travel plans are related solely to drug interdiction and therefore necessarily fall outside the scope of a traffic stop. The dissent’s implications to the contrary are unsupported by common sense, by the very precedents they rely on, and by the rule that courts may not scrutinize the motives behind otherwise permissible police actions. Whren v. United States, 517 U.S. 806, 811-13, 116 S.Ct. 1769, 1773-74, 135 L.Ed.2d 89 (1996).
That the traffic stop was extended for a few minutes by Conklin’s preliminary questioning is undeniable. But this process required as long as it did for reasons beyond Conklin’s control. There were four occupants in Brigham’s car, and Brigham’s and Franklin’s inconsistencies and evasions created suspicion, requiring further detective efforts by Conklin. The dissent challenges the reasonableness of Conklin’s actions by noting that, had he looked closer at the Buick’s rental papers, he would have observed that Brigham and Dorothy Harris shared the same address and that, as a 50-year-old woman, she was of the right age to be Brigham’s mother. This is an easy conjecture in hindsight, but it is unsupported by the district court’s fact-findings. In any event, the discrepancy between Dorothy Harris’s name as lessee and Brigham as driver, together with the fact that none of Brigham and his *511 companions appeared old enough to drive a rental car, gave cause for further inquiry. The dissent’s concern that questioning unrelated to the purpose of a traffic stop may unconstitutionally extend a detention is valid, in abstract terms, but not on the facts of this case.
Second, neither our prior cases nor any other caselaw of which we are aware institutes a per se rule requiring an officer immediately to obtain the driver’s license and registration information and initiate the relevant background checks before asking questions.[12] The dissent seems to conclude that allowing questioning, even legitimate questioning, before initiating computer checks[13] constitutes an end-run around Dortch and Jones and, by its inefficiency, unconstitutionally prolongs the detention.[14] There is, however, no constitutional stopwatch on traffic stops. Instead, the relevant question in assessing whether a detention extends beyond a reasonable duration is “whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.” Sharpe, 470 U.S. at 686, 105 S.Ct. 1568 (citing Michigan v. Summers, 452 U.S. 692, 701 n. 14, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981)); see also United States v. Hardy, 855 F.2d 753, 759 (11th Cir.1988) (“the most important factor [for courts to consider] is whether the police detained [the defendants] to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference”). Computerized license and registration checks are an efficient means to investigate the status of a driver and his auto, but they need not be pursued to the exclusion of, or in particular sequence with, other efficient means. Some lines of police questioning before the initiation of a computer check are often reasonable, as they may enable swift resolution of the stop. On the facts of this case, Trooper Conklin’s investigative methods were reasonable, proceeded with deliberation in response to evolving conditions, and evince no purposeful or even accidental unnecessary prolongation.
Third, by prescribing the scope, duration and order of Conklin’s investigation, the dissent would impose a “least intrusive means” test contrary to express statements of the Supreme Court. See Sharpe, 470 U.S. at 687, 105 S.Ct. 1568 (“the fact that the protection of the public might, in the abstract, have been accomplished by ‘less intrusive’ means does not, by itself, render the search unreasonable.”) (quoting Cady v. Dombrowski, 413 U.S. 433, 447, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973)) (internal quotation marks omitted). Instead, the Court holds, “the question is not simply whether some other alternative *512 existed, but whether the police acted unreasonably in failing to recognize and pursue it.” Id. Sharpe also cautioned courts against engaging in “unrealistic second-guessing,” and noted that “creative judge[s] engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished.” Id. at 686-87, 105 S.Ct. 1568. A requirement like the one articulated by the panel and implied by the dissent — that there is a single, formulaic approach that an officer must adopt in order to allay his reasonable suspicions during a traffic stop — would engraft upon the Fourth Amendment the very type of bright-line rule the Supreme Court has consistently eschewed. See, e.g., Robi-nette, 519 U.S. at 39,117 S.Ct. 417.
For the reasons discussed above, we do not presume to prescribe in the abstract the scope of questioning, investigative techniques, or length of permissible detention that may be undertaken following a valid traffic stop. The bounds of existing caselaw are clear, if fact-intensive: a traffic detention may last as long as is reasonably necessary to effectuate the purpose of the stop, including the resolution of reasonable suspicion, supported by articu-lable facts within the officer’s professional judgment, that emerges during the stop. Because Trooper Conklin’s actions were not unreasonable under the circumstances of this case, the detention of Brigham and his companions did not violate the Fourth Amendment.
Absent a Fourth Amendment violation, Brigham’s consent to search the vehicle was not unconstitutionally tainted. See Gonzalez, 328 F.3d at 759. Further, the record supports the district court’s determination that Brigham’s consent was voluntarily given as an independent act of free will. Id. (citing United States v. Chavez-Villarreal, 3 F.3d 124, 127 (5th Cir.1993)). The evidence gathered from the Buick was thus properly obtained as the result of a consensual search.
III. CONCLUSION
For the foregoing reasons, the judgment of the district court is AFFIRMED.

. The facts are recited in the light most favorable to the Government as prevailing party.

. To assess a district court’s ruling on a motion to suppress evidence under the Fourth Amendment, we review its factual determinations for clear error and the ultimate Fourth Amendment conclusions de novo. United States v. Gonzalez, 328 F.3d 755, 758 (5th Cir.2003) (citing Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996) (other citations omitted)). The evidence is considered in the light most favorable to the prevailing party. Id. (citing United States v. Orozco, 191 F.3d 578, 581 (5th Cir.1999)).

. The Government does not dispute Brigham's standing, as the vehicle’s driver, to attack the constitutionality of the search. Compare United States v. Shabazz, 993 F.2d 431, at 434 n. 1 (5th Cir.1993), citing Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

.The Government does not contend that Officer Conklin’s stop of Brigham was a stop based on probable cause, and therefore, we apply the standard Terry analysis. However, it is important to note that at least one of our sister circuits has recently suggested that different constitutional standards may apply to stops based on probable cause. See United States v. Childs, 277 F.3d 947, 952-54 (7th Cir.2002) (en banc) (noting that the Fourth Amendment allows for a broader range of law enforcement actions where a traffic stop is supported by probable cause); see also Berkemer v. McCarty, 468 U.S. 420, 439 n. 29, 104 S.Ct. 3138, 3150 n. 29, 82 L.Ed.2d 317 (1984) ("We of course do not suggest that a traffic stop supported by probable cause may not exceed the bounds set by the Fourth Amendment on the scope of a Terry stop.”).

. See, e.g., United States v. Givan, 320 F.3d 452, 459 (3rd Cir.2003) (noting that "questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop”); United States v. Linkous, 285 F.3d 716, 719 (8th Cir.2002) ("An officer does not violate the Fourth Amendment by asking the' driver his destination and purpose, checking the license and registration, or requesting that the driver step over to the patrol car.”); United States v. Holt, 264 F.3d 1215, 1221 (10th Cir.2001) (en banc) (noting that questions relating to a motorist’s travel plans are ordinarily related to the reason for the stop); United States v. Hill, 195 F.3d 258, 268 (6th Cir.1999) (holding that an officer's question *508 ing of the defendant "as to his moving plans at the outset of the stop was reasonable in that the questions related to [the defendant’s] purpose for traveling”). United States v. Sowers, 136 F.3d 24, 27-28 (1st Cir.1998); United States v. Hardy, 855 F.2d 753, 757 (11th Cir.1988).

. For example, by posing these types of questions at the outset of a stop, an officer may discover an extenuating circumstance, e.g., that a given driver was speeding in order to get his pregnant wife to the hospital. See United States v. Holt, 264 F.3d 1215, 1221 (10th Cir.2001) (en banc) (explaining that a motorist’s travel plans typically relate to the purpose of a traffic stop because the motorist is traveling at the time of the stop and might explain, or put into context, the reasons why the motorist may have been in violation of the traffic laws).

. United States v. Jones, 234 F.3d 234, 237-41 (5th Cir.2000); Dortch, 199 F.3d at 195-200; see also Roberson, 6 F.3d at 1090-93; Gonzalez, 328 F.3d at 756-59.

. The circumstances of a stop may also give rise to reasonable suspicion of other criminal activity beyond automobile theft. Dortch excluded drug trafficking as a basis for reasonable suspicion on the facts of that case, where the driver’s license check had come back clean. See Dortch, 199 F.3d at 199. But in another case, we have found that a driver's nervousness, hesitation in responding to basic itinerary questions, lies about identification, presence on a drug trafficking corridor, and prior arrests for drug trafficking, taken together, gave rise to a reasonable and articula-ble suspicion of drug trafficking. See Gonzalez, 328 F.3d at 758.

. See also, Sanchez-Pena, 336 F.3d at 437-38; United States v. Nelson, 284 F.3d 472, 482 (3rd Cir.2002) (noting the "great deference” afforded to an officer's experience and suggesting that under Arvizu, law enforcement experience and training become "the focal point of the [Fourth Amendment reasonableness] analysis”).

. The Government does not ask this en banc court to reconsider these cases.

. In each case, the oral or written consent to search given by the driver was held tainted by the unconstitutionally prolonged detention.

. Indeed, in both Jones and Santiago, the officers interrogated the drivers and their passengers before initiating the relevant computer checks, and this court did not criticize the order of investigation. Jones, 234 F.3d at 237-42; Santiago, 310 F.3d at 337-42.

. The panel majority implies that the results of such checks are necessarily definitive, but as Trooper Conklin observed, the fact that a vehicle has not yet been reported stolen does not prove that it has not been actually stolen. Moreover, an officer might find such checks unnecessary if the license and registration information are regular and the driver and occupants answer questions clearly.

.The dissent’s logic suggests that had Trooper Conklin initiated the computer checks and then returned to the Buick to ask the same questions while the checks proceeded, such questioning would have been wholly permissible under the Shabazz and the Dortch line of cases. Oddly, then, according to the dissent, questions that would be permissible if posed during a computer check somehow become impermissible when asked before a computer check.