United States Court of Appeals
Fifth Circuit

**F I L E D**

July 17, 2007

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 06-50594

UNITED STATES OF AMERICA,

Plaintiff-Appellee

VERSUS

ROLAND ALLEN CAMPOS,

Defendant-Appellant

Appeal from the United States District Court For the Western
District of Texas, Austin Division
1:05-CR-00246

Before HIGGINBOTHAM, DAVIS and BARKSDALE, Circuit Judges.

PER CURIAM:[*]

Defendant Roland Allen Campos ("Campos") appeals his
conviction for conspiracy to possess cocaine with intent to
distribute and possession of cocaine with intent to distribute, in
violation of 21 U.S.C. §§ 841(a)(1) and 846. Campos argues that

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be
published and is not precedent except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

the district court erred in denying his motion to suppress evidence discovered in a search of the vehicle in which he was traveling, and in denying his application for authorization of expert services and motion for continuance. We AFFIRM.

## I. Background

On November 16, 2005, Appellant, Roland Allen Campos ("Campos"), and a passenger were driving north on I-35 in Round Rock, Texas in a white van. Officers Martin Flores ("Flores") and Eric Mount ("Mount"), both members of the Round Rock Police Department, were patrolling I-35 in separate vehicles. Officer Flores received a call from Officer Mount informing him that Officer Mount observed a red Neon and a white van traveling close together. Officer Mount had already stopped the Neon for failing to maintain an appropriate distance, and wanted Officer Flores to stop the van.

Officer Flores then followed the van, and, after observing Campos traveling 69 mph in a 65 mph zone, Officer Flores pulled Campos over. Campos exited the vehicle. Officer Flores approached the vehicle and asked Campos for his driver's license, but Campos only produced a Texas identification card. Flores then began to ask Campos about his travel plans. Campos replied that he was traveling from San Antonio to College Station to buy tickets for the University of Texas versus Texas A&M football game. This was suspicious to Officer Flores because Campos had already passed

2

three highways between San Antonio and Round Rock that would have led to College Station.

Next, Officer Flores asked Campos for the name of his passenger, but Campos had trouble recalling the passenger's name. Officer Flores also asked Campos about the owner of the vehicle. Although Campos stated that it belonged to his uncle, Campos's only response when questioned about his uncle's name was that it was listed on the vehicle's registration. Campos's inconsistent statements made Officer Flores suspicious that Campos was providing false information.

Campos then consented to a pat-down search, in which Officer Flores discovered $2,000 in cash in Campos's pocket. At this time, Campos continued to make inconsistent statements. Campos stated that he was going through Houston to get to College Station, which only added to Officer Flores's suspicions because Campos was traveling away from Houston. In addition, although Campos indicated that he planned on stopping at a rest area to look at a map, Campos passed a rest area less than a mile earlier. Moreover, Campos admitted that he never had a driver's license and he was unable to provide Officer Flores with proof of insurance.

Officer Flores then questioned Campos's passenger, Joe Gomez ("Gomez"). Unlike Campos, Gomez stated that they were heading to Waco, not College Station. Importantly, despite Officer Mount's suggestion that Campos and Gomez were traveling in tandem with the

3

Neon, Gomez told Officer Flores that he and Campos were traveling alone. Based on the inconsistent responses provided by Campos and Gomez, Officer Flores concluded that Campos and Gomez were not traveling to College Station to buy tickets.

Officer Flores then began records checks on Campos and Gomez. At this point, eight minutes had passed since the initial stop. While awaiting the results of the records checks, Officer Flores asked Campos if he had any dope or other illegal drugs in the vehicle, and Campos responded in the negative. Officer Flores then obtained Campos's consent to search the van. During the search, Officer Flores noticed that the bolts holding in both front seats had scratch marks, which, based on his experience as a police officer,[2] indicated that the van was being used for drug trafficking.

Officer Flores learned from Officer Mount that one of the occupants of the Neon lived on the same street as Gomez and that the Neon's driver stated that they were heading to Dallas, not College Station. When Officer Flores confronted Gomez and Campos, they admitted they were traveling with the Neon. Campos explained that they were traveling in separate cars because his friend wanted to drive his own car. However, Officer Flores knew that the Neon was a rental car. During this time, Officer Flores received the

---

[2]Officer Flores performed hundreds of traffic stops in which drug trafficking was involved, and had found narcotics on previous occasions when there was evidence that someone tampered with seat bolts.

4

return on the records checks, which reported that Joe Campos, a/k/a Roland A. Campos, was wanted for a parole violation.

Officer Flores then told Campos that he believed Campos was engaged in illegal activity. Campos continued to deny any wrongdoing. Although, at this point, Officer Flores testified that he believed he had probable cause to undertake a search, Officer Flores, a certified narcotics-canine handler, decided to use his canine, Tessa, to conduct a dog sniff search. Tessa alerted when entering the rear passenger door and driver's side door of the vehicle. Officer Flores then had the van taken to an auto shop for a more thorough search, where officials located a compartment containing several black bundles of cocaine, weighing 30.08 kilograms, on the underside of the van behind the van's heat shield.

Campos was subsequently indicted for conspiring to possess cocaine with intent to deliver and possessing cocaine with intent to deliver, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Campos moved unsuccessfully to suppress the cocaine discovered during the search of the van. Thereafter, Campos entered a conditional guilty plea, reserving his right to appeal the district court's denial of his motion to suppress.

Campos timely filed a notice of appeal.

## II. Discussion

Campos raises three arguments on appeal. He argues that the

district court erred by (1) failing to suppress the evidence found in the search of the vehicle; (2) denying his application for authorization of expert services; and (3) denying his motion for continuance. We will address these issues in turn.

A. Suppression of Evidence

When reviewing the denial of a motion to suppress, we review findings of fact for clear error and conclusions of law de novo.[3] We construe all facts in the light most favorable to the government as the prevailing party.[4]

Campos argues that the cocaine discovered during the search of the van should be suppressed because Officer Flores (1) purposefully delayed running the records checks; and (2) did not have probable cause to search the van because the drug dog was unreliable.

1. Reasonableness of Detention

We evaluate the legality of a traffic stop under Terry v. Ohio[5].[6] In determining whether a seizure has exceeded the scope of a permissible Terry stop, we undertakes a dual inquiry: (1) whether the officer's action was justified at its inception; and (2) whether it was reasonably related in scope to the circumstances

---

[3]United States v. Gonzalez, 328 F.3d 755, 758 (5th Cir. 2003).

[4]Gonzalez, 328 F.3d at 758.

[5]392 U.S. 1 (1968).

[6]United States v. Jenson, 462 F.3d 399, 403 (5th Cir. 2006).

that justified the interference in the first place.[7]

Although in the district court Campos challenged the validity of the initial traffic stop, he no longer argues that the stop of his vehicle for speeding was improper. Rather, Campos argues that the stop was unlawfully prolonged because Officer Flores did not run the records checks until eight minutes into the stop, rendering his detention unreasonable under the Fourth Amendment.

Officer Flores's actions are plainly permissible under our case law. An officer may request a driver's license, insurance papers, vehicle registration, run a computer check, issue a citation, and ask about the purpose and itinerary of a driver's trip.[8] An officer may also undertake similar questioning of the vehicle's occupants to verify the information provided by the driver.[9] In addition, we have specifically held that records checks need not be initiated prior to an officer's initial questioning of a vehicle's occupants.[10]

In United States v. Brigham, the officer did not initiate records checks until eight minutes into the initial stop. Prior to running the records checks, the officer asked the driver for his

[7]United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004) (en banc).

[8]Id. at 508 (citation omitted); United States v. Shabazz, 993 F.2d 431, 437 (5th Cir. 1993) (citation omitted).

[9]Brigham, 382 F.3d at 508 (citation omitted).

[10]Id. at 510-11.

license, insurance papers, questioned him about his travel plans, and sought to verify the driver's story with the car's three passengers. We concluded that the officer's actions were reasonable.

Campos argues that his case is distinguishable from Brigham because Officer Flores's testimony indicates that he purposefully engages in delays in initiating records checks so as to extend the amount of time he has for investigation. We reject this argument. "[T]he touchstone of Fourth Amendment analysis is reasonableness," and "[r]easonableness is measured in objective terms by examining the totality of the circumstances."[11] Therefore, as long as Officer Flores's investigative methods were objectively reasonable, his subjective motives are irrelevant.[12]

We agree with the district court that Officer Flores's investigative methods were reasonable. Prior to running the records checks, it was permissible for Officer Flores to request Campos's license, conduct a pat-down search of Campos, and question Campos and Gomez about their travel plans.[13] This process required

---

[11]Id. at 507 (citations and internal quotations omitted) (emphasis added); see id. ("Supreme Court's insistence on reasonableness rather than prescriptions for police conduct").

[12]See United States v. Causey, 834 F.2d 1179, 1184 (5th Cir. 1987) (en banc) ("so long as police do no more than they are objectively authorized to do, their motives in doing so are irrelevant and hence not subject to inquiry").

[13]See Brigham, 382 F.3d at 508; United States v. Dortch, 199 F.3d 193, 198 (5th Cir. 1999).

as long as it did for reasons beyond Officer Flores's control.[14] Campos's and Gomez's inconsistent statements regarding their travel itinerary, Campos's lack of a valid driver's license, the discovery of $2,000 in cash on Campos's person, and Campos's inability or unwillingness to identify the name of the owner of the van all created suspicion, necessitating further detective efforts by Officer Flores. In this case, Officer Flores's questioning "exemplified a graduated response to emerging facts."[15]

Because Officer Flores's actions were not unreasonable under the circumstances of this case, the detention of Campos did not violate the Fourth Amendment.

### 2. Reliability of Drug Dog

Campos argues that Tessa, the drug dog, was unreliable, and thus, Officer Flores did not have probable cause to search and seize the van.[16] After a thorough review of the testimony and evidence before it, the district court found the canine alert to be reliable and concluded that Officer Flores had sufficient probable cause to seize and search the van.

---

[14]See Brigham, 382 F.3d at 510; United States v. Jones, 234 F.3d 234, 241 (5th Cir. 2000).

[15]See Brigham, 382 F.3d at 509.

[16]While Campos urges us to answer the question of whether a defendant can challenge the reliability of a canine alert so as to defeat probable cause based on that alert, we decline to do so here. Campos acknowledges that the district court allowed him to present evidence tending to show that Tessa was unreliable, and thus, the only question before us is whether, on this record, the district court erred in concluding that the canine alert was reliable.

As Campos concedes, the positive alert of a properly trained drug detecting dog, standing alone, provides probable cause to support a search and seizure.[17]   It is undisputed that Officer Flores, Tessa's trainer and handler for nearly two years, and Tessa successfully completed all standard training procedures and that Tessa was certified to detect a variety of narcotics, including cocaine.   However, Campos argues that Officer Flores gave subtle "handler cues"[18] to Tessa.   According to Campos, the videotape of the incident, which was admitted into evidence, reveals that Officer Flores was not neutral in his handling of Tessa because, even after Tessa seemingly failed three times to alert, Officer Flores took Tessa to the other side of the van to make another attempt at alerting, and when Tessa sat down, Officer Flores exclaimed, "Oh, yeah!"   In addition, Campos maintains that Officer Flores is not credible because he testified that Tessa had never made a false positive alert, and Campos subsequently offered evidence showing that Tessa had made three false alerts.

Contrary to Campos's arguments, the district court found that Tessa was reliable.   In particular, the district court found that all but one of the possible false alerts by Tessa were reasonably explained away by Officer Flores.   In addition, the district court

_____

[17]E.g., Gonzalez, 328 F.3d at 759; Dortch, 199 F.3d at 197; United States v. Dovali-Avila, 895 F.2d 206, 207 (5th Cir. 1990).

[18]A "handler cue" is a conscious or unconscious signal that leads a canine to where the handler believes the drugs are located.

made a determination that Officer Flores was credible, which we will not disturb.[19] Moreover, the district court determined that the videotape demonstrated that Tessa's repeated entries into the van were not merely redundant, and thus, rejected Campos's suggestion that the dog was being cajoled into an alert.

We find no clear error in the district court's factual finding that the canine alert was reliable and therefore uphold the district court's ultimate conclusion that Officer Flores had probable cause to seize and search the van.

B.  Application for Authorization of Expert Services

Campos argues that the district court erred in not granting his request under 18 U.S.C. § 3006A(e)(1) for a canine-alert expert.  We review the district court's denial of an application for authorization of expert services for abuse of discretion.[20]

On January 31, 2006, Campos filed an application for authorization of the services of a canine-alert expert.  On February 3, 2006, the district court denied Campos's application without prejudice to refile his application with the expert's name, a statement of the expected expenses, and information explaining what is a canine-alert expert and how one becomes such an expert. Instead of promptly filing an amended application in compliance with the district court's instructions, Campos waited until

---

[19]See United States v. Lopez, 74 F.3d 575, 577 (5th Cir. 1996).

[20]United States v. Hardin, 437 F.3d 463, 468 (5th Cir. 2006).

February 9, 2006, the day before the suppression hearing (which was set in the January 13, 2006 pre-trial order), to file his amended application.    As a result, the district court denied Campos's application as untimely.

Campos alleges that the district court improperly required him to provide information not called for by the statute.    Section 3006A(e)(1) provides:

> Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation may request them in an ex parte application.  Upon finding, after <u>appropriate inquiry</u> in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court . . . shall authorize counsel to obtain the services [at government expense].[21]

The statute does not define the scope of an "appropriate inquiry" and Campos offers no authority limiting what a district court may request in order to make such an inquiry.  Moreover, we have held that "[t]o justify authorization . . . under § 3006A(e)(1), a defendant must demonstrate with <u>specificity</u>, the reasons why such services are required."[22]

In determining whether the services of a canine-alert expert were necessary, the district court's denial of Campos's first application and request that Campos provide the above-mentioned

---

[21]18 U.S.C. § 3006A(e)(1) (emphasis added).

[22]<u>See</u> <u>United States v. Gadison</u>, 8 F.3d 186, 191 (5th Cir. 1993) (citation omitted) (emphasis in original); <u>see</u> <u>also</u> <u>Hardin</u>, 437 F.3d at 469 n.5.

information was certainly reasonable.[23]  Without such specific information, the district court could not adequately appraise Campos's need for expert services.

In addition, the district court did not abuse its discretion in denying Campos's second application as untimely.[24]

### C.  Motion for Continuance

Campos argues that the district court erred in denying his motion for continuance.  We review the denial of a defendant's motion for continuance for an abuse of discretion resulting in serious prejudice.[25]

Three days before the February 10, 2006, suppression hearing, Campos filed his motion for continuance, alleging that he was not able to complete discovery because records concerning Tessa had not been provided.  According to Campos, he made the motion as soon as he became aware that the government did not provide any field-performance or training logs of Tessa.  However, the standing discovery order, which was filed in this case on January 13, 2006, did not require the government to produce such documents,[26] and

---

[23]See Gadison, 8 F.3d at 191.

[24]See Scott, 48 F.3d at 1396 ("The rights established by 18 U.S.C. § 3006A(e) are procedural, and the failure to make a timely motion or request waives the necessity for the court's consideration of an appointment of an expert witness." (quotations and citation omitted) (emphasis added)).

[25]United States v. Pollani, 146 F.3d 269, 272 (5th Cir. 1998).

[26]The standing order required that the government turn over, inter alia, "documents . . . that the government intended to use as evidence at trial to prove its case-in-chief . . . ."

13

Campos made no discovery complaints for these documents until the day before the suppression hearing.

Campos contends that the denial of his motion prejudiced him because it was essential for him to provide Tessa's training and field logs to his canine-alert expert so that such expert could assess the reliability of Tessa's alert. We reject this contention. Assuming arguendo that a defendant can challenge the reliability of a canine alert, once the requested documents were produced, Campos was able to cross-examine Officer Flores regarding the contents of Tessa's field performance records. Furthermore, evidence at the suppression hearing clearly demonstrated Tessa's reliability such that any evidence presented by Campos's expert would not have affected the finding of reliability.[27] Moreover, since the district court subsequently denied Campos's application for authorization of expert services, Campos's argument that he needed the records for such expert is unpersuasive.

The district court's decision to deny Campos's motion for continuance was not an abuse of discretion.

## III. Conclusion

For the foregoing reasons, we AFFIRM the district court's judgment.

AFFIRMED.

---

[27]See United States v. Diaz, 25 F.3d 392, 395 (6th Cir. 1994) (limited information on which expert's opinion was based, i.e., trial transcripts (and not actual observations of the drug dog), detracted from the expert's testimony).