**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
April 12, 2012

Lyle W. Cayce
Clerk

No. 11-30538

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

DERRICK DESHUN ERVIN,

Defendant-Appellant

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:10-CR-6

Before JONES, Chief Judge, and OWEN and HIGGINSON, Circuit Judges.

PER CURIAM:[*]

During a traffic stop in West Baton Rouge Parish, a search of Defendant Derrick Deshun Ervin's car uncovered evidence of counterfeited securities. The district court denied Ervin's motion to suppress the evidence. Ervin conditionally pleaded guilty to a one-count indictment charging him with possession of counterfeited securities, in violation of 18 U.S.C. § 513(a). At sentencing, the district court enhanced Ervin's offense level by six points based on its calculation of the intended loss and its conclusion that Ervin had relocated

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-30538

a fraudulent scheme to another jurisdiction to evade law enforcement. In addition, the district court upwardly departed from the Sentencing Guidelines range. Ervin appeals, arguing that the evidence was the fruit of an illegal detention that violated his Fourth Amendment rights. Ervin also challenges the district court's calculation of his Guidelines and subsequent upward departure. For the reasons that follow, we affirm Ervin's conviction and sentence.

## FACTS AND PROCEEDINGS

On the evening of January 5, 2010, Officer Donald Vallet was working traffic interdiction on Interstate 10 in West Baton Rouge Parish. At the time, Officer Vallet had been with the West Baton Rouge Sheriff's office for two years, and he had been working highway traffic interdiction there since August 2009. Officer Vallet also had approximately eight years of additional law enforcement experience, having been an officer with the Brusly Police Department and the Port Allen City Marshal's office, where he worked highway interdiction. In addition, Officer Vallet had received 200 hours of interdiction training, ranging from basic to advanced, and he was a certified K-9 narcotics handler. On that evening, January 5, 2010, the narcotics K-9 was inside Officer Vallet's patrol vehicle.

Just before 8:00 p.m., Officer Vallet watched as a red Lincoln, approaching his sheriff's vehicle, dropped speed, pulled behind a small pickup truck and followed closely behind the truck for half a mile to three quarters of a mile at a rate of 70 miles per hour. Because the vehicle was traveling too closely behind the pickup truck, in violation of Louisiana law, Officer Vallet activated his lights and siren and conducted a traffic stop. Upon activating his lights and siren, a video camera in Officer Vallet's patrol car turned on automatically, and, as a result, the entire stop was video recorded.

2

No. 11-30538

When Officer Vallet instructed the driver to exit the vehicle, the driver got out and walked toward the rear of his vehicle, stopping just prior to its rear end. After reviewing Ervin's driver's license, Officer Vallet informed Ervin that he had been stopped for following too closely behind the pickup truck, in violation of Louisiana state law. Officer Vallet also asked Ervin about his travel plans, to which Ervin initially responded that he was traveling from Atlanta to Houston to visit his sister. Officer Vallet then asked Ervin for his registration and insurance. Ervin told the officer that it was a rental car, but when Officer Vallet asked to see the rental agreement, Ervin admitted that he did not have one. Ervin explained that because he was a "preferred member" of the rental agency, he did not receive a rental agreement. Ervin then produced a card entitled "Emerald Club Member."

Officer Vallet asked Ervin how long he planned to be in Houston. Rather than repeating that he was going to visit his sister, Ervin answered that he was going to Houston to start a limousine business and that he would be there for about six months. Officer Vallet then asked Ervin whether he had any tickets and about his arrest record, to which Ervin stated that he had tickets years ago and that he had only been arrested twice, once for going AWOL and later for a stolen vehicle charge. Officer Vallet then returned to his patrol car to run Ervin's license and to check his criminal history through dispatch. Dispatch informed Officer Vallet that Ervin had been arrested several times for fraud and forgery, in addition to the AWOL and stolen car charges.

Throughout their interaction, Officer Vallet testified that Ervin seemed "overly nervous for a minor traffic violator" and that he "continued to look away so as not to make eye contact while speaking," which further raised Officer Vallet's suspicions. Officer Vallet also thought that Ervin's body language indicated a state of nervousness because he was moving his hands and twitching his face.

3

No. 11-30538

For these reasons, Officer Vallet decided to investigate further and radioed Corporal Hebert for assistance. Approximately five minutes later, Corporal Hebert arrived on the scene, but he did not get out of his patrol car. At that point, Officer Vallet asked Ervin to again exit his car. Ervin complied, but once again he stopped at the rear end of his vehicle, and so Officer Vallet had to ask him to move to the front of his patrol car. Officer Vallet returned Ervin's driver's license and issued him a verbal warning in lieu of a ticket. Ervin thanked Officer Vallet for the warning and turned to walk away. Just as Ervin turned back toward his vehicle to leave, Officer Vallet said to him, "Can I ask you a question?" Ervin then turned back around and stepped toward Officer Vallet. Officer Vallet explained to Ervin that there was a problem with people transporting illegal contraband along I-10 and asked him whether he was carrying guns, currency, or narcotics in his vehicle. Ervin responded negatively to each question.

Officer Vallet then asked Ervin for consent to search his vehicle. At first, Ervin answered "yes," but appeared "uneasy." Sensing this unease, Officer Vallet advised Ervin of his right to refuse consent. Because Ervin still appeared apprehensive, Officer Vallet told him that he would "accept that as a refusal and conduct a free-air sniff of the vehicle using" his K-9 unit. Officer Vallet then frisked Ervin for weapons, removed the K-9 from his patrol car, and began the free-air sniff. The K-9 unit positively alerted to the front of the vehicle. Thereafter, Ervin was read his *Miranda* rights, and Officer Vallet and Corporal Hebert then began searching the vehicle. Inside Ervin's vehicle, they found no narcotics. The officers uncovered blank checks, printers, Social Security information on several individuals, documents related to making identification cards, and identification cards with Ervin's photo and names of other individuals. A Secret Service Task Force Agent arrived at the location and later obtained written consent from Ervin to search the vehicle. A subsequent search

4

No. 11-30538

of Ervin's vehicle yielded additional counterfeit checks, as well as merchandise that Ervin admitted buying with the counterfeit checks at Best Buy stores in Alabama and Georgia.

Ervin filed a motion to suppress the evidence obtained during the January 5, 2010 search of his vehicle arguing that, during the traffic stop, he was illegally detained after the issuance of a verbal warning because the officer had no reasonable suspicion of additional criminal activity. The government filed an opposition to the motion, and a suppression hearing was held. Judge Polozola presided over the hearing but subsequently filed an order of recusal, and the case was reassigned to Judge Brady.

The district court, now successor Judge Brady, denied the motion to suppress in a written order.

Following the denial of his motion to suppress, Ervin entered into a written plea agreement, pleading guilty to the charge in the indictment. As part of the plea agreement, Ervin agreed to waive his right to appeal or collaterally challenge his conviction or sentence. However, he reserved the right to appeal the following: "(a) any punishment imposed in excess of the statutory maximum; (b) any punishment which was an upward departure pursuant to the guidelines; (c) any punishment which was above the guidelines range calculated by the Court; and (d) the order [] denying his motion to suppress."

In calculating the recommended Guidelines range, the PSR increased the base offense level by four levels pursuant to § 2B1.1(b)(1)(C) (for losses greater than $10,000) because the PSR calculated the loss amount to be $20,215.86. The PSR also added two levels pursuant to § 2B1.1(b)(10)(A), which allows an increase if the defendant relocates a fraudulent scheme to another jurisdiction to evade law enforcement. Two levels were subtracted for Ervin's acceptance of responsibility resulting in a total offense level of 10. Based on a total offense

5

No. 11-30538

level of 10 and a criminal history category of VI, the PSR calculated Ervin's Guidelines sentence range to be 24 to 30 months.

The PSR also noted that an upward departure for inadequate criminal history under § 4A1.3 would be appropriate in this case because Ervin's criminal history category substantially underrepresented the seriousness of Ervin's criminal history and because of the likelihood that Ervin would commit other crimes.  Ervin submitted written objections challenging the amount of loss and the applicability of § 2B1.1(b)(9).  At sentencing, the district court overruled the objections and adopted the factual findings of the PSR.  The district court then, over Ervin's objection, upwardly departed and sentenced Ervin to 36 months of imprisonment.

## DISCUSSION

### I.  Denial of Motion to Suppress

#### a.  Standard of Review

Where a district court has denied a motion to suppress evidence, we review its factual findings for clear error and its conclusions of law de novo.  *United States v. Pack, II*, 612 F.3d 341, 347 (5th Cir. 2010).  We view the evidence in the light most favorable to the party that prevailed below.  *United States v. Cantu*, 230 F.3d 148, 150 (5th Cir. 2000).  We may affirm the district court's decision on any basis established by the record.  *United States v. Charles*, 469 F.3d 402, 405 (5th Cir. 2006).

Ervin suggests that a relaxed standard of review is appropriate because the district judge who denied the suppression motion was not the same judge who was present at the suppression motion hearing.  Unlike the case cited by Ervin, *United States v. Horton*, 488 F.2d 374 (5th Cir. 1973), the instant case does not present a situation where the successor district judge made neither findings of fact nor conclusions of law in rendering a ruling.  *See id.* at 379-80.

6

Rather, the district judge had the opportunity to determine the credibility of Officer Vallet by reading his sworn testimony at the suppression hearing and comparing it to a visual and audio recording of the encounter.  It is also notable that Officer Vallet, whose testimony is essential, displayed restraint inasmuch as when he received arguably valid consent from Ervin to search the vehicle, he interpreted Ervin's unease in delivering that consent as a refusal.  Furthermore, the testimony of Officer Vallet was uncontradicted by any other witness's testimony and defense counsel had an opportunity to cross-examine Officer Vallet.

The district judge then articulated his findings of facts and conclusions of law in a written order.

### b. *Fourth Amendment Merits*

"The stopping of a vehicle and detention of its occupants constitutes a 'seizure' under the Fourth Amendment." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc).  A limited search and seizure is permissible under the Fourth Amendment, even in the absence of probable cause, when "there is a reasonable and articulable suspicion that a person has committed or is about to commit a crime." *United States v. Jones*, 234 F.3d 234, 239 (5th Cir. 2000). The legality of a traffic stop is examined under the two-pronged analysis described in *Terry v. Ohio*, 392 U.S. 1 (1968). *Brigham*, 382 F.3d at 506.  First, the court examines whether the officer's action was justified at its inception; second, the court determines whether the officer's subsequent actions were reasonably related in scope either to the circumstances that justified the stop, or to dispelling a reasonable suspicion developed during the stop. *Id.* at 506-07.

The first part of the two-part *Terry* inquiry is not at issue in this case. Ervin does not contend that Officer Vallet lacked justification in stopping him

No. 11-30538

for following too close, in violation of Louisiana law.[1]  In fact, Ervin asserts that the illegal detention began after Officer Vallet issued a verbal warning in lieu of a ticket.  Ervin argues that Officer Vallet's decision to detain him beyond the time it took to investigate Ervin's traffic offense violated the second part of the *Terry* inquiry because the facts that emerged during Officer Vallet's investigation of his traffic stop could not have created reasonable suspicion that Ervin was engaging in additional criminal activity.

During a traffic stop, an officer may examine driver's licenses and vehicle registrations and he may run computer checks. *Pack, II*, 612 F.3d at 350.  An officer may also ask questions about the purpose and itinerary of the trip and ask questions on subjects completely unrelated to the circumstances causing the stop so long as those questions do not extend the stop's duration. *Id.*  In order to prolong a detention after issuing a citation or determining that no citation should be issued, an officer must have developed a reasonable suspicion of additional criminal activity in the course of the stop and before the initial purpose of the stop has been fulfilled. *United States v. Cavitt*, 550 F.3d 430, 436 (5th Cir. 2008).  "If the officer develops reasonable suspicion of additional criminal activity during his investigation of the circumstances that originally caused the stop, he may further detain its occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *Pack II*, 612 F.3d at 350.  "Reasonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the search and seizure." *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006).  The determination of whether Officer Vallet had developed a reasonable suspicion must be based on the totality

---

[1] Ervin also does not dispute on appeal the probable cause basis for the car search, even though no drugs were discovered after the dog alert.

of the circumstances and his collective knowledge and experience. *See id.* at 631-32.

At the suppression hearing, Officer Vallet first set forth his experience in highway interdiction, including a year and a half working interdiction and 200 hours of training in interdiction. Officer Vallet then articulated several facts that led him to suspect that Ervin may have been involved in criminal activity before Officer Vallet decided to prolong the detention. From the outset, Officer Vallet found it suspicious that Ervin, while approaching the sheriff's vehicle, dropped speed, changed lanes, and took a close position behind another vehicle. Officer Vallet testified that in his training and experience, such activity was an attempt "to blend in with other traffic, not stand out."[2] Officer Vallet then found it suspicious that twice when Ervin exited his vehicle, he "stopped just prior to the back of his vehicle, as if to stay close to the vehicle." Based on Officer Vallet's training and experience, people acting in such a manner indicate that "they have something that is of value or there's something connected to that car that they don't want to get too far from." During his interaction with Ervin, Officer Vallet noticed that Ervin "seemed overly nervous for a minor traffic violator" as evidenced by Ervin's avoidance of eye contact. Officer Vallet also did not find out of all suspicion the sequence in which Ervin expressed his travel plans. Ervin initially stated that the purpose of his trip was to visit a family member and later added that the purpose of the trip was to start a new business. The fact that Ervin was unable to produce a rental agreement raised Officer Vallet's suspicions because "[s]ometimes that is a way to distance yourself from the vehicle, or you don't want anybody to see who rented it or if it was rented in

---

[2] Ervin asserts that there was an innocent explanation for his driving patterns. In addressing Ervin's assertions that attempt to isolate and undercut specific factual findings, the district court correctly cited our precedent in *United States v. Pack, II*, 612 F.3d 341 (5th Cir. 2010), which set forth that, "it is improper for a court to refuse to find that reasonable suspicion existed because each of a set of circumstances has an innocent explanation. The proper question is whether or not the entire set of circumstances, taken together, created reasonable suspicion of criminal activity." *Id.* at 358.

a false name." Further, Officer Vallet found it suspicious that Ervin failed to disclose fully the details of his criminal history. When these facts were considered in the context that Ervin was traveling from Atlanta to Houston on I-10, cities and a route Officer Vallet understood to be common for contraband trafficking, and in light of a videotape that did not refute Officer Vallet's account of what transpired,[3] the district court concluded:

> [Ervin's argument that the police did not act diligently enough in an investigation to dispel their reasonable suspicion] is without merit. The video and testimony offered indicate that the police did not act unreasonably or in a dilatory manner. Defendant's argument amounts to "unrealistic second-guessing" and is unsupported by the record. *See United States v. Brigham*, 382 F.3d 500, 511-12(5th Cir. 2004) [(en banc)]

The district court did not err in finding that Officer Vallet had articulated specific facts demonstrating that additional reasonable suspicion existed and concluding that the prolonged detention was consonant with Ervin's Fourth Amendment rights. *See Pack, II*, 612 F.3d at 362; *United States v. Gonzalez*, 328 F.3d 755, 759 (5th Cir. 2003); *see also United States v. Conlenzo-Huffman*, 292 F. App'x 361, 365 (5th Cir. 2008) (unpublished) (concluding that officers were not "dilatory in their investigation of [defendant's] vehicle" when they detained defendant after issuing him a citation telling him he was free to leave).

## II. Appeal of Sentence

The government asserts that Ervin has waived his right to appeal the district court's calculation of his Guidelines range. We review de novo whether

---

[3] To the extent that Ervin alleges that the videotape is in tension with Officer Vallet's testimony—for example, Ervin claims the videotape refutes Officer Vallet's assertion that Ervin seemed nervous during the encounter—our independent review of the videotape does not demonstrate that Officer Vallet's testimony, nor the district court's crediting of that sole witness testimony, was incorrect.

a waiver of a right to appeal bars an appeal. *United States v. Baymon*, 312 F.3d 725, 727 (5th Cir. 2002). To determine whether an appeal of a sentence is barred by an appeal waiver provision in a plea agreement, we conduct a two-step inquiry into: "(1) whether the waiver was knowing and voluntary and (2) whether the waiver applies to the circumstances at hand, based on the plain language of the agreement." *United States v. Bond*, 414 F.3d 542, 545 (5th Cir. 2005) (citation omitted). Ervin does not dispute that he entered into his written appeal waiver knowingly and voluntarily. Instead, he contends that the plain language of his agreement permits him to appeal the district court's calculation of his Guidelines range.

In *United States v. Teal*, 269 F. App'x 468 (5th Cir. 2008) (unpublished), the defendant "pleaded guilty pursuant to a plea agreement in which he waived his right to appeal except, in pertinent part, in the case of a sentence imposed as a result of an upward departure or a sentence above the guidelines range calculated by the district court." *Id.* at 468. The defendant in *Teal* attempted to appeal the district court's denial of a sentencing reduction for acceptance of responsibility and we denied the appeal, stating, "[a] knowing and voluntary appeal waiver reserving the right to appeal in cases of an upward departure does not preserve an appeal of the district court's finding of facts that relate to the district court's calculation of a defendant's guidelines range of imprisonment." *Id.* (citing *United States v. McKinney*, 406 F.3d 744, 746-47 (5th Cir. 2005) and *United States v. Gaitan*, 171 F.3d 222, 223-24 (5th Cir. 1999)).

The circumstances here are similar. In his plea agreement, Ervin expressly waived his right to appeal his sentence with the exception of "(a) any punishment imposed in excess of the statutory maximum; (b) any punishment which is an upward departure pursuant to the guidelines; (c) any punishment which is above the guidelines range calculated by the Court; and (d) the order [] denying his motion to suppress." By the plain language of his plea agreement,

when Ervin reserved his right to appeal an upward departure pursuant to the Guidelines, he did not also preserve his right to appeal the district court's finding of facts that relate to the district court's application of offense-level enhancements in calculating his underlying Guidelines range of imprisonment. *See Teal*, 269 F. App'x at 468.

Ervin did, however, reserve his right to appeal the district court's upward departure pursuant to the Guidelines. After applying the offense enhancements set forth in U.S.S.G. §§ 2B1.1(b)(1)(C) and 2B1.1(b)(10)(A), the district court decided to depart upwardly pursuant to the Guidelines. Departure decisions are reviewed under an abuse of discretion standard for "reasonableness" in light of the sentencing factors in 18 U.S.C. § 3553(a). *Gall v. United States*, 552 U.S. 38, 46 (2007). "A sentencing court does not abuse its discretion in deciding to upwardly depart when its reasons for doing so (1) advance the objectives set forth in 18 U.S.C. § 3553(a)(2); (2) are authorized by 18 U.S.C. § 3553(b); and (3) are justified by the facts of the case." *United States v. Saldana*, 427 F.3d 298, 310 (5th Cir. 2005).

At sentencing, the district court stated that it had "considered the United States Sentencing Guidelines and the sentencing factors enumerated in 18 U.S.C. § 3553(a)." The district court observed that Ervin "got kicked out [of the Army] because [he was] using hospital computer data to defraud people in an egregious manner." The district court also noted that Ervin still had some outstanding warrants and that he had been in and out of jail. The district court then recounted Ervin's ten prior convictions and stated that the sentence was meant to slow down Ervin and prevent him from being a "one-man . . . fraud and forgery . . . crime spree in several states." The district court concluded that the original Guidelines total offense level did not adequately consider the seriousness of these considerations. In properly considering the recommended Guidelines range and the objectives set forth in § 3553(a), the district court did

not abuse its discretion in upwardly departing from the original range. *See United States v. Zuniga-Peralta*, 442 F.3d 345, 347-48 (5th Cir. 2006)

For the foregoing reasons, Ervin's conviction and sentence are AFFIRMED.